## RICE BROTHERS & NIXON, Appellants, v. NATIONAL BANK OF COMMERCE, Respondent.

### Kansas City Court of Appeals, April 6, 1903.

1. **Contracts: INDEMNITY: CONSIDERATION: MEANS: MALUM IN SE.** When a consideration for a contract of indemnity is illegal, the contract is void whether the illegality is disclosed by the contract itself or established by evidence outside; and the law which prohibits the end will not lend its aid in promoting the means designed to carry it into effect, and makes no distinction between *malum in se* and *malum prohibitum*.

2. ———: ———: ———: ———: ———. Where several parties claim the ownership of property, and the party in possession, supposing one to be in the right and upon the request of such party, does acts which are legal in themselves though they finally prove in violation of the rights of others, may make a valid contract of indemnity against such acts; but he must be an innocent party and not a willful participator in the wrong.

3. ———: ———: ———: ———: ———. Plaintiffs shipped with their own, certain cattle of others to the market. On reaching there they found several claimants for such cattle, and among them defendant to whom plaintiffs turned them over and took a contract of indemnity. *Held*, plaintiffs were trespassers in shipping the cattle, and the contract with defendant was nothing more than indemnity for their trespass and therefore invalid.

Appeal from Jackson Circuit Court.—*Hon. James Gibson,* Judge.

AFFIRMED.

*John Burgin* and *Beardsley, Gregory & Kirshner* for appellants.

Filed an argument on the merits.

*Elijah Robinson* for respondent.

Filed argument in reply.

ELLISON, J.—This is an action on a contract of indemnity. At the close of the evidence for plaintiffs, in consequence of the ruling of the trial court they were compelled to take a nonsuit, and failing to have it set aside have come here for relief.

The substance of plaintiffs' petition and upon which they depend for a cause of action is, that in November, 1898, they shipped from the interior of the State of Kansas, to Kansas City, Missouri, a large lot of cattle belonging to them. That on arriving at Kansas City they discovered, for the first time, that 128 head of these were not theirs. That they likewise learned of a number of claimants to them, each claiming adversely to the other, among whom was defendant. That it was thereupon agreed between them and defendant that in consideration of their turning the cattle over to defendant, the latter would indemnify and protect them against damages by reason of their act. That thereafter another claimant to said cattle brought his action against plaintiffs and others in a court of competent jurisdiction in Kansas, wherein, among other allegations, he charged plaintiffs with having converted said cattle to their own use. That afterwards, judgment for damages for the value of the cattle was obtained against plain-

tiffs. That they duly notified defendant of the institution of such suit and demanded of it that it defend said action, which it failed to do. That afterwards plaintiffs were compelled to and did pay such judgment.

The facts developed at the trial, so far as is necessary to state in view of our conclusion, are that one Gillet, who was a large cattle dealer in Kansas, was largely indebted to a number of persons, several being bankers and others commission men in Kansas City, Missouri. It appears to have become suddenly known that he was insolvent. Among others, plaintiffs and defendant were his creditors, each claiming mortgage liens on certain of his cattle. When plaintiffs were advised of Gillet's condition they immediately sent an employee into Kansas to get what cattle they could, presumably those covered by their mortgage. This employee was joined by Nixon, one of the plaintiff's firm, and together they found a large lot of cattle in two enclosures about four miles apart. They immediately took possession of them consisting, according to Nixon's testimony, of about 850 head, and drove them about twenty-five miles to a shipping point on a railroad where they shipped them to Kansas City. Of these, 128 head were not subject to plaintiffs' claim and to which, confessedly, they had no right. On arriving at Kansas City, plaintiffs became aware that other creditors of Gillet were likewise in search of his cattle upon which they could lay hands. Several, including defendant, made claim to a lien on the 128 head. Plaintiffs separated them from the main number and proceeded with the latter into the State of Iowa. It was then agreed between plaintiffs and defendant that plaintiffs would turn the 128 head over to defendant, the latter agreeing to indemnify them in case they were forced to respond in damages to the true owner, or, indeed, to any one of superior right. Plaintiffs, as stated by their principal witness, were anxious to get the cattle into other hands so as to rid themselves of liability. They did

not have an opinion as to which of the several claimants of liens had the best right or title; but they decided to turn the cattle over to defendant for the reason that they thought it to be more certainly responsible than the others.

The general principle of law invoked by defendant's counsel to defeat plaintiffs' action is well settled. It is that when the consideration for a contract is illegal the contract is void, whether the illegality is disclosed by the contract itself, or is established by evidence outside. Sumner v. Summers, 54 Mo. 340. In furtherance of this principle, it is also well settled, "that any promise, contract or undertaking, the performance of which would tend to promote, advance or carry into effect an object or purpose which is unlawful, is in itself void, and will not maintain an action. The law which prohibits the end will not lend its aid in promoting the means designed to carry it into effect; and in this respect, the law gives no countenance to the old distinction between *malum in se* and *malum prohibitum*. That which the law prohibits, either in terms or by affixing a penalty to it, is unlawful; and it will not promote in one form, that which it declares wrong in another." White v. Buss, 3 Cush. 448, quoted with approval in Sprague v. Rooney, 104 Mo. 349. And the same principle is stated by Bishop on Contracts, sections 470, 471, 476. So it was held that a contract of indemnity to one for libel could not be enforced. Atkins v. Johnson, 43 Vt. 78.

There is an exception, however, to the foregoing rule, which bears directly on the character of contract in controversy. Thus, as stated in the case just cited, where questions arise between different parties as to the ownership of property, and a third person supposing one party to be in the right, upon the request of such party does acts which are legal in themselves, but which finally prove to be in violation of the rights of the other party and in consequence is made liable in

damages. In such instance a contract of indemnity will be upheld. So, where two parties claim title adversely to personal property and one employs a third person to assist in removing it on a promise of indemnity, such third person, believing his employer had title, may recover on the contract. Avery v. Halsey, 14 Pick. 174. To the same effect is Ives v. Jones, 3 Ired. 540. But in those cases, and running through all others which we have examined, is the proviso, directly expressed, or else plainly implied, that the party doing the illegal act must have been an innocent party. He must not have been a willful participator in the wrong. In Stone v. Hooker, 9 Cowen 154, the court said: "The distinction taken between promises of indemnity that are, and those which are not void, is this: If the act directed or agreed to be done, is known at the time to be a trespass, an express promise to indemnify would be illegal and void; but if it was not known at the time to be a trespass the promise of indemnity is a good and valid promise." See also Torpy v. Johnson, 43 Neb. 882.

What are the facts in this case, as applicable to the law we have just stated? It is not disputed that when plaintiffs, without leave or authority, took possession of the cattle and shipped them a great distance to Kansas City, they committed a wrongful and unlawful act against the owner of the cattle, as well as against those who had valid liens on them. That was a trespass which the law does not excuse. The contract of indemnity made with defendant was no more nor less than a contract for protection against that unlawful act. If a man may validly contract for protection against his unlawful acts, he is encouraged to continue in the commission of such acts. Taking an extreme case for illustration: Suppose one should steal property and thereafter, becoming alarmed at what he had done, should turn the goods over to another, not the owner, on the latter's

promise to protect him from civil damage. Would any one say that it was a valid promise?

But plaintiffs' counsel, by way of extenuating the trespass, and in order to fortify the claim of right to indemnify, have stated that it was shown at the trial that it was dark when they took possession of the cattle and they could not see the brands on them. In answer to a question on cross-examination, one of plaintiffs' witnesses said that Nixon told him that "he [Nixon] had gone down there and got the cattle in the nighttime —it was dark and he could not see the brands." The testimony of the parties themselves (Nixon and Rice) show such was not the fact. They found the cattle in two inclosures, four miles apart, and after taking them out they drove them twenty-five miles to a railroad and then shipped them to Kansas City. It is wholly unreasonable to suppose that all this could have been done under cover of one night. Daylight must have overtaken them before the cattle were got aboard the cars. But be that as it may, plaintiffs knew, of course, when they turned them over to defendant that they had committed a grievous trespass, and with that knowledge they sought and obtained a contract of indemnity. We are satisfied that it can not be upheld, and therefore affirm the judgment. All concur.