THIRD NAT. BANK OF ST. LOUIS v. RICE.*

(Circuit Court of Appeals, Eighth Circuit.   May 2, 1908.)

No. 2,707.

**1. TROVER AND CONVERSION—EFFECT ON TITLE TO PROPERTY OF JUDGMENT AND SATISFACTION THEREOF.**

The payment of a judgment in conversion vests the title to the property converted in the defendant as of the date of the conversion, as between the parties, but not as against a third claimant of the property, to whom the defendant voluntarily surrendered it after the conversion and before the judgment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trover and Conversion, § 314.]

**2. MONEY RECEIVED—RIGHT OF ACTION—MONEY RECEIVED UNDER CLAIM OF RIGHT.**

Plaintiffs wrongfully converted certain cattle, which they afterwards surrendered to a bank claiming a right to them, and which caused them to be sold. Defendant claiming a mortgage on the cattle, demanded them from plaintiffs, who stated that they had turned them over to the bank and disclaimed any interest therein. The bank then also disclaiming any interest, the proceeds of the cattle were paid over to defendant. Subsequently a third party recovered a judgment for the conversion against plaintiffs, which they paid. *Held* that, the money having been received under claim of right, there was no promise on the part of defendant implied from the transaction which would support an action against it by plaintiffs for money had and received to their use.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Money Received, § 28.]

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

Thomas F. Galt, for plaintiff in error.

Alfred Gregory and R. F. Walker (Beardsley, Gregory & Kirshner, on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge.   The defendant in error (plaintiff below) recovered judgment in the sum of $2,086.77 against the plaintiff in error (defendant below) in an action of assumpsit for money had and received.   To reverse this judgment, this writ of error is prosecuted.   The controversy arose out of the following state of facts, briefly stated:

One Gillette, a large dealer in cattle in Kansas, who seems to have had a mania, as well as genius, for giving multiplied and conflicting chattel mortgages on the same herd or lot of cattle, by either mixing up the brands or giving the cattle an ostensible different situs, in 1898 acquired about 1,866 head of Texas cattle with the brand "J. A. L." There were various mortgages on these cattle.   Notes issued by him, apparently secured by such mortgages, were negotiated by cattle·commission merchants at Kansas City, Mo., to various purchasers, who seem to have taken them avidiously on account of the high rate of interest they bore and the assumed security on tangible cattle.   In

*Rehearing denied June 19, 1908.

November, 1898, after he had exhausted his resourcefulness in obtaining money and credit by such factitious methods, and his creditors began to press him, threatening him with prosecutions for obtaining money under false pretenses, Gillette fled the country, taking refuge in the Republic of Mexico. Among those claiming mortgage liens upon some of the Gillette cattle was the firm of Rice Bros. & Nixon, doing business at Kansas City, Mo., as commission cattle merchants. After Gillette left, Rice Bros. & Nixon sent one George Rice to the pastures out in Kansas to look after the cattle in which they claimed an interest. He found some of the cattle, with the brand on which they claimed a mortgage lien, in what is known as the "Plum Feed Lots" and some in what is known as the "Brogan Pasture." He discovered on inspection that these cattle were mixed with those of another brand. Brogan, in charge of the cattle in his lots, refused to let George Rice remove them. Thereupon Nixon, of said firm, went out and met Rice. After consultation, they invaded the Brogan pasture between midnight and 1 o'clock a. m., broke down the fence, and drove away all of the cattle in the lot several miles to Neosho, a station on the railroad leading to Kansas City. Nixon then went to the Plum lot, and, leaving enough cattle there to secure Plum as an agister of Gillette, drove the residue to Neosho, and shipped the whole of the two lots to Rice Bros. & Nixon at the stockyards in Kansas City. Included in these lots of cattle were 128 head bearing a different brand from that to which the plaintiffs laid any claim. Nixon knew, when thus tortiously removing the cattle, that there were among them those to which his firm asserted no claim. His only excuse for this lawless act was the trouble and difficulty of separating in the nighttime the different brands. When the cattle reached the yards at Kansas City, Nixon separated those on which the plaintiff claimed a lien and reshipped them to a pasture in the state of Iowa. Instead of making restitution, as far as they might, by returning the 128 head of cattle to the close where Nixon found them, Nixon, acting for his firm, left them in charge of one Munger, their bookkeeper, with instructions to turn them over to the person he (Munger) might think best entitled to them.

Other creditors of Gillette were on the qui vive, looking out for any Gillette cattle which might come to said stockyards, as there was considerable clamor among them as to their respective rights to the Gillette cattle. Among them was the National Bank of Commerce of Kansas City, which had a branch bank at said stockyards under the immediate management of one Voorhees. Learning about the situation of said 128 head of cattle, the president of said bank, with an inspector, looked over them and informed Munger that the bank held large amounts of Gillette paper and was anxious to get hold of as many of the Gillette cattle as possible. Rice Bros. & Nixon were evidently anxious to get out of the ugly and embarrassing situation into which Nixon's tortious conduct had brought them, by unloading the burden on any one willing to take it. Accordingly Munger turned the 128 head of cattle over to the National Bank of Commerce, with the understanding between them that the bank would hold them harmless from the consequences of their acts in the transaction. As this

arrangement was between Munger, representing the plaintiff, and the bank, it is important to follow the testimony of Munger, a witness on behalf of the plaintiff. After stating that Nixon separated the 128 head of cattle in question from the others shipped in by him and taking those claimed by the firm to a pasture in Iowa, he was asked, "In whose charge did Nixon leave the 128 head of cattle"? He answered: "In my charge." Then, stating that Nixon said to him "to turn them over to the parties to whom I thought had the best claim on them," he was pressed, on cross-examination, to state the exact language or terms employed between him and the representative of the bank in turning the cattle over to the latter. His answer was that Voorhees said "that the National Bank of Commerce owned a large amount of Gillette paper, and they were making an effort to secure all of the cattle in which Gillette was interested in any way, and asked me to turn these cattle over to the bank." After stating that Voorhees said the bank would have the cattle sold and the money held as a special deposit until the rightful ownership was decided, he was asked:

"If the National Bank of Commerce did not say that they would hold the firm of Rice Bros. & Nixon harmless against any loss that they might suffer on account of your turning these cattle over to them? A. Yes, sir. * * *. He (Voorhees) asked me to turn the cattle over to the National Bank of Commerce. I asked him if the National Bank of Commerce would stand good to us for the cattle in case anybody else proved a better title or a better right to them. * * *. A. I did. * * * And he said that they would. If we would turn these cattle over to him, or to the National Bank of Commerce, they would stand good to us and protect us from all liability. But I did not immediately turn them over to him. I called Mr. Winants (the vice president of the bank) over the telephone and told him what Mr. Voorhees had said and the proposition Mr. Voorhees had made to me, and I asked him to confirm it, and he did. He said the National Bank of Commerce would do that. Q. Why did you wish to turn these cattle over to anybody? A. Because they did not—because we had no claim on them. Q. Is it not a fact that you were anxious to get rid of the cattle, so as to avoid being held for them, and anxious to get somebody else to take them off your hands? A. We were anxious to get rid of the cattle. Q. Were you not anxious to turn these cattle over to somebody else, in order to get rid of the liability for them? Is that not a fact? A. To a certain extent. Q. Is it not a fact? A. Yes."

He then stated that he turned the cattle over to the National Bank of Commerce for Rice Bros. & Nixon.

"Q. I will ask you if you turned these cattle over to the National Bank of Commerce to hold for the account of Rice Bros. & Nixon? A. I did not. Q. I will then ask you again if you did not turn these cattle over to the National Bank of Commerce for them to hold as their own interest? A. I did not."

Then, being inquired of as to why he turned the cattle over to the National Bank of Commerce, he answered:

"Because I thought that in all probability they had a better claim to them than anybody else on account of their owning a large amount of paper taken from the various commission firms at the Kansas City Stockyards. * * * We had absolutely no claim on the cattle."

The Bank of Commerce, discovering that it had no lien on these cattle, in turn became anxious to get rid of them. The representative of the bank advised Munger of that fact, and inquired what should be done with the cattle. Thereupon it was agreed to turn them over to

the Siegel-Sanders Commission Company to sell. At that time the cattle were in a lot subject to the order of Munger, and he gave to Voorhees a "title order in blank for them."

"Q. Was there anything in this order that the National Bank of Commerce was to hold these cattle for the person who held rightful title to them? A. The title orders are blanks furnished by the stockyards, and they do not permit anything to be written on the order except the number of animals and to whom the stock belongs and to whom it is to be delivered. That order, then, had to be surrendered to the stockyards company."

On further cross-examination of Munger, the following occurred:

"Q. I will ask you to relate your conversation with Mr. Voorhees when you turned these cattle over to him? A. Mr. Voorhees told me that the National Bank of Commerce owned a large amount of Gillette paper; that they were trying to secure as many of the cattle as possible in which Gillette had any interest; and he told me, if they would turn the cattle over to them, they would be responsible to us—hold us harmless for the value of the cattle, if there were any one appeared who had a better right to them. Q. Is it not a fact that you turned these cattle over to the National Bank of Commerce because you thought that they were the most responsible parties, that they would be able to protect you against loss? A. That is partly, but not wholly, the reason. Q. What was the other reason? A. I thought the chances were that they would have a better right to the cattle than the other claimants, inasmuch as they had taken a large amount of this Gillette paper from the various commission merchants at the yards."

The Third National Bank of St. Louis (defendant below) at that time held a mortgage on Gillette cattle, which it claimed covered the 128 head in question. Its claim was placed in the hands of Mr. Ball, an attorney of Kansas City, who applied to Rice Bros. & Nixon, and informed them that his client held a mortgage on the cattle, and demanded that they be turned over to him, when he was informed "that they had nothing more to do with it; that those cattle were in charge of Siegel-Sanders Commission Company for the Bank of Commerce, and they had nothing to do with it." Thereupon Mr. Ball demanded the cattle of said commission company. He was informed by them that the Bank of Commerce claimed them, and that they had the cattle for sale, and they would proceed to sell them and turn the money over to the Bank of Commerce. Mr. Ball further testified that it was suggested in the interview that, as the cattle were in the yards on expense, Siegel-Sanders Company could sell them and deposit the money in the Bank of Commerce until it could be ascertained whether the Third National Bank of St. Louis or the Bank of Commerce was entitled to it. When he applied to the Bank of Commerce, he learned from Mr. Winants (vice president) that the Siegel-Sanders Company had sold the cattle and kept the money, and the Bank of Commerce made no claim to it. He then applied to Siegel-Sanders Company for the proceeds, and received from them a check therefor, which he indorsed and forwarded to his client. He further stated that he did not remember the brand of the cattle, but:

"I remember that I claimed under what was known as the Dunlap mortgages, and that they bore the brands purporting to be covered by those mortgages."

Soon after the foregoing occurrences, a suit was instituted, of rather a peculiar comprehensive character, in the district court of Chase

county, Kan., by one of Gillette's mortgagees, asserting priority of right to certain of the Gillette cattle, including the 128 head in question. Rice Bros. & Nixon, among others, were made parties defendant, and appeared thereto. Although named as a defendant, the Third National Bank of St. Louis was not served with process and did not appear to that suit. After taking evidence, a decree was entered therein, by consent, determining the manner in which the funds in the hands of the receiver of that court arising from the sales of cattle to which there were conflicting claims should be apportioned among them; also rendering judgment against Rice Bros. & Nixon for the value of the cattle wrongfully taken by them as aforesaid. Having satisfied that judgment, Rice Bros. & Nixon at once instituted an action at law in the circuit court of Jackson county, Mo., against the National Bank of Commerce, based on said contract of indemnity between them, made on their behalf by Munger. They were defeated in that action, on the ground taken by the court that the contract was contrary to public policy. See 98 Mo. App. 696, 73 S. W. 930, where the case is reported. Nixon having retired from the copartnership, and one of the Rice Bros. having died, W. H. Rice, as surviving partner, instituted the present action against the defendant, the Third National Bank of St. Louis, to recover the money so received by it as aforesaid, and obtained judgment therefor.

The contention on the part of the plaintiff is that, although Rice Bros. & Nixon were trespassers ab initio in seizing the cattle, when they satisfied the judgment against them for the tort they became substituted to the owner's right to the cattle from the date of the conversion. The correctness of this, as a general proposition of law, may be conceded. Lovejoy v. Murray, 3 Wall. 11, loc. cit. 18 L. Ed. 129; Adams v. Broughton, Stra. 1078; 2 Kent's Comm. 388; Thayer v. Manley, 73 N. Y. 307; Smith v. Smith, 51 N. H. 571, which hold that the title so acquired by the tort-feasor takes effect from the time of the conversion. This, resting upon the maxim, 'solutio pretii emptionis loco habetur,' presumes that the wrongdoer is in possession of the property and has not voluntarily parted therewith to a third party. Judge Cooley, in his work on Torts (3d Ed., pp. 881, 882), says:

"It was decided in Adams v. Broughton, Stra. 1078, that judgment in trover or trespass for the value of the property vested the title in the defendant; and this decision has been followed in this country to some extent. * * * The title by relation vests as of the time when the conversion took place; but this relation is not effectual for all purposes. It could not render a third party a trespasser upon the rights of the defendant for anything done by him intermediate the conversion and the judgment; and if, after conversion, the plaintiff sold his interest in the property, the purchaser will not be affected by the suit, * * * since by the sale he has disabled himself from passing title to the defendant."

In support of the text he cites the case of Bacon v. Kimmel, 14 Mich. 201, where the plaintiff brought trespass, and for the purpose of proving title introduced a judgment against him in favor of the mortgagee in a chattel mortgage from whom the property had been wrongfully taken, and which judgment was subsequent to the trespass complained of in the case. Judge Christiancy said that admitting the recovery of that judgment and its satisfaction by the plaintiff—

"had the effect as between them to vest the right of property and the possession in the plaintiff, and that as between them it related back, so as to perfect the plaintiff's title from the time of the trespass for which that judgment was obtained. Still it could not affect the defendants in this suit, so as to make them trespassers as against the plaintiff. * * * There is no evidence in the case tending to show that at any time during the period covered by the declaration the plaintiff had any right whatever to the property or its possession, nor tending to show that in obtaining possession the defendants were guilty of a trespass against any one, much less against the plaintiff. And, whatever effect the recovery and satisfaction of Wheeler's judgment against the plaintiff should have had as between them by relation back, it cannot by such relation make the defendants trespassers for acts which did not constitute a trespass as against the plaintiff at the time it was committed."

To sustain the action at bar, the learned counsel for the plaintiff assume, as indeed they must, first, that the National Bank of Commerce received the cattle from Rice Bros. & Nixon as mere bailees, or under an express or implied trust to hold them for the benefit of the rightful owner whenever he might appear; and, second, that Siegel-Sanders Commission Company took them impressed with a like trust, which followed and attached to the proceeds in the hands of the defendant in favor of the plaintiff as the cestui que trust. That Rice Bros. & Nixon turned the cattle over constructively to the National Bank of Commerce on the controlling assurance that the bank would hold them harmless is confirmed by the undisputed fact that immediately after Rice Bros. & Nixon satisfied the judgment against them they made demand on the Bank of Commerce, not for the proceeds of the sale of the cattle, which they knew had been turned over to the Third National Bank of St. Louis, but for the amount paid by them in satisfaction of said judgment, based on the promise of indemnity. In their petition, as disclosed in the reported case (98 Mo. App. 696, 73 S. W. 930), they alleged:

"That it was thereupon agreed between them and defendant that in consideration of their turning the cattle over to defendant the latter would indemnify and protect them against damages by reason of their act."

As stated by the court from the evidence:

"It was then agreed between plaintiffs and defendants that plaintiffs would turn the 128 head over to the defendants; the latter agreeing to indemnify them in case they were forced to respond to damages to the owner, or, indeed, to any one of superior right. Plaintiffs. as stated by their principal witness, were anxious to get the cattle into other hands, so as to rid themselves of liability. They did not have an opinion as to which of the several claimants of liens had the best right or title; but they decided to turn the cattle over to defendant, for the reason that they thought it to be more certainly responsible than the others."

Moreover, as already shown by the testimony of Mr. Ball, witness for the plaintiff, when the Bank of Commerce advised Mr. Munger that it made no claim to the cattle, to get out of the tangle Munger gave the blank "title order" for the transfer of the catle from their lot to that of Siegel-Sanders Commission Company to be sold. And when Mr. Ball applied to Rice Bros. & Nixon for the cattle, stating that the Third National Bank of St. Louis claimed them under mortgage, they distinctly disclaimed any interest in the cattle, and said they had turned them over to the bank. They were apprised, therefore, of the de-

fendant's assertion of right to the cattle, and they knew that the Siegel-Sanders Commission Company turned over the proceeds to the defendant. It does not now lie in the mouth of the plaintiff, as asserted in argument by his counsel, to say they do not know that the defendant ever held such mortgage. They were distinctly advised by Mr. Ball that his client asserted such mortgage, and they consented to what was done without asking to see the mortgage; and the trial in this case proceeded upon the theory that the plaintiff in the action in the Kansas district court claimed under mortgage superior in right to that of the defendant.

How, then, can it be legally possible for the plaintiff to maintain against the defendant the action for money had and received to his use? When demand was made upon them by Mr. Ball, they disclaimed any interest whatever in the cattle. There was, therefore, no fiduciary relation, or promise, either expressed or implied, between them and the defendant. It is an ancient and deep-rooted axiom of the common law, which "use has made familiar and time has rendered sacred," that "the law will not imply a promise where there was an express promise; so the law will not imply a promise of any person against his own express declaration, because such declaration is repugnant to any implication of a promise." Whiting v. Sullivan, 7 Mass. 107; Earle v. Coburn, 130 Mass. 596. While there are instances where the law will imply a promise to pay by a party who protests, as where the law creates a duty to perform that for which it implies a promise to pay, as in the illustration of the refusal of a man to furnish food and clothing to his wife and children, yet the rule is that such promise shall never be implied against protest, except in cases where the law itself imposes the duty, which must be a legal, and not a mere moral or sentimental duty. This idea is expressed by Woodruff, J., in Butterworth v. Gould, 41 N. Y. 463, as follows:

"Where a defendant has received moneys due to the plaintiff but claiming it as his own under circumstances in which he has no authority from the plaintiff, and does not act under any pretense of such authority, and the payment to him is made in proposed recognition of his title thereto as his own, and does not operate to discharge the payor from his liability to the plaintiff, then and in such case there is no trust and no implied promise to pay the money to the plaintiff."

Had Rice Bros. & Nixon, after the conversion of the cattle, maintained the statu quo, retaining the cattle or the proceeds until they satisfied the judgment in trespass against them, their title would have attached as of the date of the conversion; and had the defendants in that situation, between the date of the conversion and the satisfaction of the judgment, tortiously taken the cattle or their proceeds from Rice Bros. & Nixon, they could have sued in trover, or have waived the trespass and brought action in assumpsit. But when, after the first conversion, the wrongdoers, as in this case, to extricate themselves, as they intended to do and supposed they were accomplishing, from ultimate liability and loss, voluntarily turned the property over to a third claimant, not in trust for themselves, but as an independent claimant, there was not an expressed or implied promise by the third person to answer to the assenting wrongdoer for the property. Multo fortiori,

they cannot maintain trespass or trover, as they assented to the taking. We are unable to find any precedent to support the action adopted by the plaintiff; and, in our judgment, established principles of law and procedure interdict it. The request of the defendant below for a directed verdict should have been given.

The judgment of the Circuit Court is therefore reversed, and the cause remanded, with direction to grant a new trial and for further proceedings in conformity with this opinion.