## LIBERTY FINANCE COMPANY, INC., *v.* BENJAMIN CATTERTON ET AL.

[No. 84, October Term, 1931.]

*Decided January 14th, 1932.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Samuel J. Aaron,* with whom was *Howard L. Aaron* on the brief, for the appellant.

*George E. Robinson* and *Joseph Loeffler,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

On February 5th, 1929, Benjamin Catterton and Annie L. Catterton, his wife, the appellees, executed to the Liberty

Finance Company, Inc., the appellant, a corporation engaged in the "petty loan" business in the City of Baltimore, a mortgage on certain personal chattels and a leasehold property known as 818 McKean Avenue in that city, to secure a loan of $300, with interest thereon at the rate of three and one-half per cent. per month, payable in thirty monthly installments of ten dollars plus accrued interest.

After having paid $80 on account of the principal debt, and $68.68 on account of interest, Mr. and Mrs. Catterton, on October 10th, 1929, applied for an additional loan of $80 and, to secure that loan and the unpaid balance of the original loan, executed another mortgage to the appellant identical with the first except as to the date. Having paid on account of the principal debt secured by that mortgage $80, and on account of interest $79.17, on June 25th, 1930, they applied for a further loan of $80, and to secure that loan and the balance due on the second mortgage they executed a third mortgage which, except as to its date, was a duplicate of the first, and they paid on account of the principal of that mortgage $25, and on account of interest $98.92. The first mortgage was duly recorded, but the second and third mortgages were not, and although the second mortgage was in substitution of the first and the third in substitution of the second, neither the first nor the second mortgage was released or surrendered. As a result of those transactions, the appellant had loaned to the appellees $480, on which they had paid on account of the principal $185, and on account of interest $246.77, and it held three mortgages executed by them aggregating $900 to secure a loan which at no time exceeded $300.

On May 13th, 1931, plaintiffs, through their counsel, Mr. George E. Robinson, wrote the appellant asking to be informed of the balance due on the mortgage debt and interest, and were told that $275 was due on account of principal and $8.66 on account of interest. The appellees thereupon, on May 29th, 1931, filed the bill of complaint in this case, on the theory that, since by each of the three mortgages a chattel real was pledged together with chattels personal for the repayment of the loan, no interest in excess of six per cent.

could be legally charged or collected, because, they said, the Small Loan Act did not permit any person holding a license under its provisions to charge or to collect interest at a rate higher than that on a loan secured by real estate or chattels real, independently, or combined with chattels personal. Accordingly, they prayed (1) for an accounting; (2) that all payments made by them in excess of six per cent. be credited on account of the principal debt and interest accrued at six per cent.; (3) that the appellant be compelled to accept such balance as might be found to be due after that credit had been made; (4) that it be required to account to the plaintiffs for all usurious and excessive interest collected from them; and (5) that the mortgages be declared void under "the Uniform Small Loan Law of Maryland."

A demurrer to the bill (as amended) was overruled, and the appellant filed an answer, supported by affidavit, in which it expressly disclaimed any intention of enforcing the lien against the leasehold property, and admitted that the first and second mortgages had been paid. The case was heard on bill, answer and testimony, and at the conclusion of the hearing the chancellor decreed that the defendant was entitled to collect from the plaintiffs "no more than six per cent. interest per annum on the three mortgages mentioned in the bill of complaint in this case, by reason of the fact that said mortgages are mixed mortgages, including real estate as well as chattels," and accordingly directed that the plaintiffs should be credited with interest payments in excess of that rate, and that, upon payment into court of the balance due on the principal and accrued interest thereon at six per cent. after that credit, the three mortgages should be released. The appeal is from that decree.

The particular question submitted by the appeal is whether the Uniform Small Loan Law, Code, art. 58A, applies to loans secured by the pledge of real property, either independently or in combination with chattels. In addition to that question, the appellant in this court raised the question of the constitutionality of the act. But since that question was not passed upon by the trial court, and since in that

court appellees not only failed to make that objection, but actually relied on the act in support of their contentions, it will not be considered by this court (*Summerson v. Schilling*, 94 Md. 589, 51 A. 610), except in so far as reference to it may be incidental to the main question.

The preamble to chapter 88 of the Acts of 1918 sums up in a few words the experience of men in dealing with the practices of persons who lend money in relatively small amounts on doubtful security to those to whom poverty and necessity have left no other resource. It declares that:

> "Whereas, There is and has long been conducted in this state an extensive business, in the making of small loans of three hundred dollars ($300) and less, to persons in need of funds to meet immediate necessities; and

> "Whereas, The conduct of such business has long been a cause of general complaint, and of much hardship and injustice to borrowers, and there is no regulation or provisions of law which has proved effective for the protection of such borrowers and for the punishment of usurious money lenders; and

> "Whereas, It is recognized that the business of lending small sums of money upon security that is not acceptable to ordinary financial institutions does and will exist and there is a real need for the enactment of a law that will enable its continuance under proper supervision; and

> "Whereas, It appears that in the conduct of such business, greater risk is incurred than is ordinarily incident to lending money by banks, trust companies and other money lenders to whom marketable security is given, and greater labor and expense is required in examining into the character and circumstances of the borrower, searching public records and collecting the money loaned; therefore, this remedial Act."

The ceaseless conflict between the rapacity of money lenders and the necessities of borrowers constitutes a problem which has perplexed lawmakers from the beginning of authen-

tic history, and their efforts to solve it are reflected in the communal and statutory law of such ancient peoples as the Jews, the Greeks and the Romans, as well as in the laws and customs of the Middle Ages and of the present day. Since the borrowing of money by the relatively poor is so often under the drive of dire and immediate necessity, it has been found that the complete prohibition of high rates of interest on small loans on doubtful security is impracticable and ineffective, and the whole trend of modern thought is that the reasonably adequate protection of the borrower in such cases can only be afforded by regulation. Countless instances illustrate the oppression and the injustice wrought on small needy borrowers by the callous and cruel greed so often found in the class engaged in the business of lending money in small amounts to those who have little to offer as security except their future earnings, or used and worn articles of little value to any one other than the borrowers, by whom they are needed for the ordinary purposes of daily life. In the very nature of things, such borrowers are frequently illiterate, often inexperienced, and usually, as a result of ignorance, inexperience, poverty, or necessity, incapable of defending themselves against wrongful, oppressive, fraudulent, or extortionate exactions by the lender. It was to mitigate rather than eradicate the evils incident to the business, and to afford to the borrower the greatest practicable measure of protection, that the act was passed. It is therefore remedial in its nature, and should be construed liberally so as to effect its purpose. *Savings Bank v. Weeks,* 110 Md. 91, 72 A. 475.

Coming to the immediate question, an examination of the act permits no reasonable conclusion other than that its purpose and effect are to regulate the "business" of making small loans and not to classify or define the security which may be pledged for the repayment of such loans. Not only is that purpose stated precisely and definitely in the title of the act, but in its entire text there is no language which can be construed as a classification or a definition of the "security" which the borrower may pledge. In that respect the "business" differs from that of a "pawn broker," to which it

is nearly related, who lends on the security of personal prop-
erty. Code, art. 56, secs. 17, 18. But that the two busi-
nesses are distinct is evidenced by the fact that the license fee
exacted of the pawn broker is one hundred dollars per an-
num, while that required of the small loan broker is fifty
dollars. The reason given in the preamble of the act in sup-
port of the police power under which it was adopted was not
the nature of the security usually offered to secure such
loans, but its inadequacy, but the security afforded by chat-
tels real or real estate may be quite as doubtful and uncer-
tain as that given by personal chattels, nor is there any
sound reason why a borrower compelled to pledge real prop-
erty, which, because of incumbrances or other reasons, has
no marketable value, for a small loan, should not have the
same protection as that given to one who pledges personal
property for such a loan. In either case, the reason which
compels the borrower to resort to a lender authorized to charge
what would but for the act be usurious and unlawful rates
of interest is the same, the fact that the only security he is
able to offer "is not acceptable to ordinary financial institu-
tions" and has no certain marketable value.

Chapter 88 of the Acts of 1918 repealed chapters 835 and
836 of the Acts of 1912, and was obviously adopted as a
substitute for those acts.´ Chapter 835 made it unlawful for
persons other than "pawnbrokers, real estate brokers on loans
secured by mortgage on real estate and licensed petty loan
brokers loaning money in this State" to exact, demand, or
receive any sum in addition to the rate of interest fixed by
Code, art. 49, sec. 1, on any loan less in amount than one
hundred dollars. Chapter 836 regulated the business of petty
loan brokers and permitted such brokers to charge on chattel
loans not exceeding five hundred dollars, in addition to the
legal rate of interest, stated amounts to cover commissions,
title fees, and other incidental expenses. But in that act that
privilege was limited to loans on personal chattels, and
secured by chattel mortgages or bills of sale. But in the Act
of 1918 the maximum limit of the loans to which the legis-
lation applied was reduced from five hundred to three hun-

dred dollars, and any reference to the nature of the security which might be pledged for the repayment of such loans omitted. To hold, therefore, that the Act of 1918 (chapter 88), as amended by chapter 115 of the Acts of 1924, only applies to personal chattels would be to read into it a classification of the security which may be taken to secure loans made under its authority, which the Legislature deliberately and intentionally omitted, and to that extent to usurp the power which the Constitution has conferred exclusively upon it. *Bradshaw v. Lankford*, 73 Md. 430, 21 A. 66.

Unless, therefore, the act is void in its entirety because it is in conflict with some provision of the Constitution of this State or the Constitution of the United States, it applies to loans on real estate, personal property, or both. While its constitutionality was neither questioned nor considered in the trial court, and will not, therefore, be considered in this case, yet the reasoning of the court in the following cases, in which the question of the possible conflict between similar legislation and the provisions of the Constitutions of the several states in which the question has arisen, as well as the Fourteenth Amendment of the Federal Constitution, supports the conclusion which has been announced. *In re Sohncke*, 148 Cal. 262, 82 P. 956; *Griffith v. Connecticut*, 218 U. S. 563, 31 S. Ct. 132, 54 L. Ed. 1151; *State v. Sherman*, 18 Wyo. 169, 105 P. 299; *People v. Stokes*, 281 Ill. 159, 118 N. E. 87, 89; *State v. Hill*, 168 La. 761, 123 So. 317; *Commonwealth v. Puder*, 261 Pa. 129, 104 A. 505; *Mut. Loan Co. v. Martell*, 222 U. S. 225, 32 S. Ct. 74, 56 L. Ed. 175.

It follows, therefore, that, since the appellant was regularly licensed to do business as a small loan broker, it was authorized to exact an interest charge of three and one-half per cent. per month on the several loans to which reference has been made, and it will be necessary to reverse the decree from which this appeal was taken, which announced a different conclusion. But in view of the fact that the appellant appears to have made no offer prior to this suit to cancel, surrender, or release the first and second mortgages executed

by the appellees to it, and which, it appears from appellant's admissions, have been satisfied, the case will be remanded, in order that the appellant may be compelled to release them.

> *Decree reversed, and case remanded for further proceedings in accordance with the views expressed in this opinion, with costs in this court to the appellant.*