COMMISSIONER OF SMALL LOANS ET AL. *v.* THE FIRST NATIONAL BANK OF MARYLAND ET AL.

[No. 175, September Term, 1972.]

*Decided March 1, 1973.*

306

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, ██ SMITH and LEVINE, JJ.

*Thomas N. Biddison, Jr.,* and *Stanford D. Hess. Assistant Attorneys General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

*Robert B. Barnhouse,* with whom were *Paul V. Niemeyer* and *Piper & Marbury* on the brief, for appellee The First National Bank of Maryland. *Norman P. Ramsey,* with whom was *Alan N. Gamse* on the brief, for appellee Maryland National Bank.

MURPHY, C. J., delivered the opinion of the Court.

Shortly after the creation of national banking associations, the Supreme Court recognized that "[n]ational banks have been national favorites," *Tiffany v. National Bank of Missouri,* 85 U. S. (18 Wall.) 409, 413, 21 L. Ed. 862, 864 (1874), a judgment that has survived to the present day. At issue in this appeal is whether appellees, Maryland National Bank (Maryland National) and First National Bank of Maryland (First National), both national banking associations located in Maryland, may charge interest on small loans at the same rate which small loan companies licensed under Maryland law are permitted to charge on comparable loans.

Appellees are authorized to do banking business under the National Bank Act, 12 U.S.C. §§ 21 *et seq.* (1970), and are controlled and supervised by the Comptroller of the Currency. As part of their business, appellees make small loans, including loans of $300 or less

to holders of their respective credit card services—Charg-It (and later Master Charge) of Maryland National and BankAmericard of First National. Maryland National made a $300 loan pursuant to its "Charg-It" loan procedure to Kathleen M. Althoff; the rate of interest charged was 1½% per month on the unpaid balance. First National made a $100 loan pursuant to its Bank-Americard cash advance procedure to Nina Jane Smith, subject to the same 1½% per month rate of interest. Subsequently, each borrower refused to repay any of the interest or principal of the loan on the ground that the interest rate of 1½% per month (18% per year) violated the usury laws of the State. The Commissioner of Small Loans of the State of Maryland (formerly the Administrator of Loan Laws) advised the respective banks that the rates of interest charged were usurious. The appellee banks maintained that the interest charges were allowed by law. Pursuant to these disputes, each bank instituted an action against the Commissioner of Small Loans and the individual borrower, seeking a declaratory judgment that national banks may lawfully charge interest on small loans at the same rates which small loan companies are permitted to charge on comparable loans. The cases were consolidated for trial in the Superior Court of Baltimore City before Judge David Ross.

Maryland usury laws limit interest charges on loans to 6% per annum simple interest on the unpaid balance; 8% may be charged on written agreement between the lender and borrower; 12% may be charged on unsecured installment loans. Maryland Code (1957, 1972 Repl. Vol.), Article 49, §§ 3, 5. However, a different rate is authorized for small loan licensees under the Maryland version of the Uniform Small Loan Act, first adopted in Maryland in 1918, now codified as Maryland Code (1957, 1972 Repl. Vol.), Article 58A. Small loan licensees operate under the supervision and regulation of the Commissioner of Small Loans and are authorized to receive interest on loans of less than $500, at a rate not to exceed 3% per month (36% per year) on that part of the unpaid bal-

ance not exceeding $300 and 2% per month (24% per year) on the unpaid balance exceeding $300 but not exceeding $500.[1] Banks are not eligible to become small loan licensees.[2] It was stipulated below that State chartered banks in Maryland make loans of $300 or less at interest not exceeding 12% per year.

Appellee banks claimed the right to charge the higher rate on small loans under federal law regulating the interest national banking associations may charge, 12 U.S.C. § 85, which provides:

> "*Any [national banking] association may* take, receive, reserve, and *charge on any loan* or discount made, or upon any notes, bills of exchange, or other evidence of debt, *interest at the rate allowed by the laws of the State,* Territory, or District *where the bank is located,* or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not

---

1. Code, Article 58A, § 16.
2. "No person, copartnership, association or corporation, shall make any loan of money . . . and charge . . . any interest . . . authorized by this article, or shall in any manner utilize any advantage provided by the provisions of this article, without first having obtained a license from the Administrator of Loan Laws. No bank, savings bank, trust company, credit union, savings and loan association, or building and loan association shall be permitted to be licensed under this article. Nothing in this article shall be construed as a[n] . . . expansion of powers conferred by law upon persons, copartnerships, associations, or corporations, not required or permitted to be licensed hereunder." Code, Article 58A, § 1.

exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run." (Emphasis supplied.)

In a well-reasoned opinion, Judge Ross concluded § 85 constituted authority for "national banks located in Maryland . . . to charge interest on loans of the amount dealt with in the Uniform Small Loan Act at the same rates of interest permitted to be charged by lenders licensed under that act." [3]

In appealing Judge Ross's decree that the interest charged on the loans in question was not usurious, appellant succinctly narrowed the issue before this Court as follows:

"If interest allowed to small loan agencies by Article 58A is within the contemplation of this definition ["interest at the rate allowed by the laws of the State . . . where the bank is located . . . ." 12 U.S.C. § 85, *supra*], appellees must prevail; if it is not, they must fail."

12 U.S.C. § 85 was first enacted, in substantially the same language as the present version, as § 30 of the National Bank Act of 1864, 13 Stat. 99; that Act substantially amended and replaced the National Currency Act of 1863, 12 Stat. 665. The intent of both statutes, founded in the severe financial problems which had developed during the Civil War, was to establish a sound and lasting system of national banking associations un-

---

3. Judge Ross's opinion is reported at C.C.H. Fed. Banking Law Rep. ¶ 95,735 and C.C.H. Consumer Credit Guide ¶ 99,168.

der federal control.[4] The debates show the great concern of the Congress, creators of the national banking system, that national banks be able to survive competition from *all* other lenders. *See* Cong. Globe, 38th Cong., 1st Sess. 2123-27 (1864).

The 1863 Act had provided that national banks could charge the interest rate "established" by state law. The 1864 Act, as introduced by Representative Hooper of Massachusetts, would have made the maximum rate of interest for national banks uniform at 7%. *Id.*, p. 1257. This version of the Bill passed the House and was forwarded to the Senate. The Senate Committee on Finance modified the House version of the interest provision to a rate "allowed" by the laws of the state or territory where the bank was located, and if no such rate was fixed, then at a rate not exceeding 7%. *Id.*, p. 2123. The debates evince a clear understanding of the difference between the two versions. Senator Grimes of Iowa stated, at p. 2125:

> "I was going to show the Senator that the law of last winter [1863 Act] is not the law he proposes to enact now. That was 'the established rate of interest' by the law of the State. What was the rate established? 6% was the rate established by the laws of the state, but there was an exception which declared that when private individuals chose to make a special contract as between themselves, the rate of interest might be as high as 10%. Now let me read to the Honorable Senator what he proposes: 'Interest at the rate allowed' not 'established'— 'at the rate allowed by the laws of the State.' 10% was allowed by the laws of the state, but 10% would not be 'established' law of the State. I apprehend that there is not a Senator who

---

4. *See* Abraham Lincoln, Special Message on Financing the War, Senate Journal, 37th Cong., 3d Sess. 121-22 (1863).

does not see that there is a very wide difference between the law of last winter which authorized them to take the rate of interest 'established' by the laws of the state, and this act which it is proposed to pass to a law, allowing them to take the rate which may be 'allowed' by the laws of the state, which runs up as high as 10%."

Senator Sherman, during the course of debate, recognized that the "allowed" version

"was intended to confer on these national banks the same privileges that are conferred by the laws of the states on other *associations* and *individuals* . . . and which will allow those national banks the same rate of interest as is provided by the local laws for the people within their own states. . . . My own preference . . . is to establish the uniform rate of interest by our law; but having been overruled on that point, I prefer now to place the national banks in each state on precisely the same footing with *individuals and persons* doing business in the state by its laws." *Id.* p. 2126. (Emphasis supplied.)

As ultimately enacted, the law permitted national banks to charge interest at the rate "allowed" (rather than "established") by State law.

The Supreme Court first construed § 30 of the National Bank Act in *Tiffany v. National Bank of Missouri, supra.* In the context of a state statutory scheme that limited state banks in Missouri to 8% interest, and allowed all other lenders to charge 10%, the Supreme Court held that the national bank could charge 10%. The Court based its decision on the intent of Congress:

"The act of Congress is an enabling statute, not a restraining one, except so far as it fixes a maximum rate in all cases where state banks of

issue are not allowed a greater. There are three provisions in section 30, each of them enabling. If no rate of interest is defined by state laws, seven percent is allowed to be charged. If there is a rate of interest fixed by state laws for lenders generally, the banks are allowed to charge that rate, but no more; except that if state banks of issue are allowed to reserve more, the same privilege is allowed to national banking associations. . . . It speaks of allowances to national banks and limitations upon state banks, but it does not declare that the rate limited to state banks shall be the maximum rate allowed to national banks. . . . It cannot be doubted, in view of the purpose of Congress in providing for the organization of national banking associations, that it was intended to give them a firm footing in the different states where they might be located. It was expected that they would come into competition with state banks, and it was intended to give them at least equal advantages in such competition. . . . Obviously, if state statutes should allow to their banks of issue a rate of interest greater than the ordinary rate allowed to natural persons, national banking associations could not compete with them, unless allowed the same. *On the other hand, if such associations were restricted to the rates allowed by the statutes of the state to banks which might be authorized by the state laws, unfriendly legislation might make their existence in the State impossible. A rate of interest might be prescribed so low that banking could not be carried on except at a certain loss.* The only mode of guarding against such contingencies was that which, we think, Congress adopted. It was to allow to national associations the rate allowed by the state to natural persons generally, and a higher rate, if state banks of issue were au-

thorized to charge a higher rate." (Emphasis supplied.)

*See also Daggs v. Phoenix National Bank,* 177 U. S. 549, 20 S. Ct. 732, 44 L. Ed. 882 (1900), wherein the Supreme Court reaffirmed its holding in *Tiffany,* concluding that where the law of the territory prescribed a 7% interest rate in the absence of an agreement otherwise, but permitted the parties to contract for any rate of interest, the National Bank Act allowed national banks to so contract beyond the 7% limit. The Court noted that, "[b]y that act, certainly no discrimination was intended against national banks." 177 U. S. at 555, 20 S. Ct. at 735, 44 L. Ed. at 884.

In *Penrose v. Canton National Bank,* 147 Md. 200, 208, 127 A. 852, 856 (1925), we held that national banks in Maryland could avail themselves of the provisions of State law making the defense of usury unavailable to a corporate borrower; we there recognized that it was "the purpose of the federal law, declared in many decisions of the Supreme Court . . . [citing *Tiffany*] to put national banks in a position of equality with state institutions for dealing in loans."

The Comptroller of the Currency, charged with the duty of supervising and regulating national banks, 12 U.S.C. §§ 1 *et seq.,* rendered an opinion in 1936 that national banks in Iowa were entitled to charge the same rate of interest allowed to small loan companies under the Iowa Small Loan Act. The opinion was incorporated in the Comptroller's *Digest of Opinions;* and in 1953 in the Comptroller's Manual for National Banks and designated as Ruling 7310.[5] Now codified as 12 C.F.R. § 7.7310 (1972), the opinion is summarized in the following language:

> "A national bank may charge interest at the maximum rate permitted by state law to any

---

5. The Comptroller has consistently adhered to this construction in more than 80 opinions.

competing state-chartered or licensed lending institution. If state law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of state law relating to such class of loans that are material to the determination of the interest rate. For example, *a national bank may lawfully charge the highest rate permitted to be charged by a state-licensed small loan company* or morris plan bank, without being so licensed." (Emphasis supplied.)

In *Northway Lanes v. Hackley Union National Bank and Trust Co.,* 464 F. 2d 855 (6th Cir. 1972), it was held that national banks located in Michigan could charge closing costs on commercial real estate loans exclusively reserved by state law to savings and loan associations. In that case, the borrower had contended that 12 U.S.C. § 85 restricts the rate of interest national banks may charge to the rate established by state law for state "banks"; that savings and loan associations were not "banks"; and that national banks, accordingly, could not charge a borrower closing costs which a savings and loan association could charge under Michigan law on the same type of loan. The court, considering the legislative history of § 85, *Tiffany* and other case law, together with the Opinions of the Comptroller of the Currency, said:

"The reference in Section 30 [§ 85] to the 'rate allowed by the laws of the State,' was not intended to be limited to a state's general usury rate but was meant to include any exceptions to that rate established for special transactions or special classes of lenders." 464 F. 2d at 862.

In *Partain v. First National Bank of Montgomery,* 336 F. Supp. 65 (M.D. Ala. 1971), the District Court held that national banks located in Alabama could charge the

same rate of interest on small loans as small loan companies were authorized to charge. On appeal this conclusion was affirmed. 467 F. 2d 167 (5th Cir. 1972).[6] *See also Rockland-Atlas Bank of Boston v. Murphy,* 329 Mass. 755, 110 N.E.2d 638 (1953) holding that national banks could charge the interest rate authorized by the Massachusetts small loan law on comparable loans, a rate also available to state banks.

We think it clear beyond question that § 85 permits national banks to charge the highest rate of interest allowed in the State to anyone, *viz.,* state banks, private persons, or specially licensed groups of lenders of any type.

In so concluding, we have carefully considered, but find no merit in appellants' argument that the provisions of § 85 must be construed so as to limit national banks to charging rates of interest allowed, in the language of *Tiffany,* to "state banks" or "lenders generally." This argument, based on their restricted reading of *Tiffany,* overlooks the factual context of that case which made "state banks" and "lenders generally" the only categories considered. Appellants' argument that § 85 was not intended to apply to small loan legislation originated decades later fails in light of the clear intent of that section to protect national banks from all other competing lenders within a state—a conclusion well fortified by the fact that Congress has not seen fit to amend § 85, notwithstanding the consistent administrative construction placed upon the section by rulings of the Comptroller of the Currency. *See Inland Waterways Corp. v. Young,* 309 U. S. 517, 524-25, 60 S. Ct. 646, 651, 84 L. Ed. 901, 906-07 (1940); *United States v. Shreveport Grain & Elevator Company,* 287 U. S. 77, 84, 53 S. Ct. 42, 44, 77 L. Ed. 175, 179 (1932).

Appellants suggest that an affirmance of the lower court's decree will:

---

6. The case was remanded to the District Court for further proceedings.

". . . put small loan licensees out of business and thwart the legislative purpose [of Art. 58A] to provide a source of loans for poor credit borrowers. The banks with their competitive advantage as to accessibility to the consumer will leave only the poorest credit risks for the small loan licensees, people which might have obtained a loan from the licensee if they constituted a small percent of the licensees' business but who cannot obtain a loan if they are its exclusive customers."

The problem, as appellants present it, is compounded by the fact that Maryland Code (1957, 1968 Repl. Vol.), Article 11, § 67, empowers state banks, if certain conditions are met, to engage in any additional banking activities permitted under federal law to any national banking association.[7] Appellants forecast a situation where marginal borrowers will be deprived of a loan source, small loan bank (national or state) borrowers will be deprived of the protections presently afforded small loan borrowers under Article 58A, and small loan licensees

7. "§ 67. Power to engage in additional banking activity or bank-related service.

"Any bank or trust company, heretofore incorporated under any general or special law of this State, and any bank or trust company hereafter incorporated under this article, is authorized and empowered, notwithstanding the restrictions and limitations imposed in this article, to consummate, negotiate, transact, or engage in any additional banking activity or bank-related service, *under the same conditions, limitations, restrictions and safeguards as are now or shall hereafter be applicable, or permitted under federal law to any national banking association,* provided, however, that this power shall only become available to the State banks and trust companies of this State with the authorization by majority vote of the Bank Commissioner, the three appointed members of the Banking Board, and three persons, not employed by any banking institution, to be appointed by the Governor, with the advice of the Secretary of Licensing and Regulation, for a two-year term, one of whom shall be an economist, one of whom shall be a certified public accountant, and the third member shall be a member of the general public. Such authorization shall be given only if it is deemed reasonably required to preserve and protect the welfare of such institutions, the general economy of this State, and will not be detrimental to the public interest and the stability of the institutions." (Emphasis supplied.)

may "seek judicial relief to break down all remaining distinctions in the law which act to impose more stringent regulation on their operations." We find it unnecessary to consider these problems which may arise in the future; they are not before us on this appeal. We have previously recognized the important state policy embodied in the Small Loan Act. *Beneficial Finance Co. v. Administrator of Loan Laws,* 260 Md. 430, 272 A. 2d 649 (1971) ; *Liberty Finance Company Inc. v. Catterton,* 161 Md. 650, 158 A. 16 (1932). In *Beneficial,* we quoted with approval from *Credit Finance Service, Inc. v. Able* (D.C. Mun. App.) 127 A. 2d 396, 398-99 (1956), that "courts should extend their protection as far as they reasonably and practically can to borrowers in this class." 260 Md. at 439, 272 A. 2d at 653. But such protection as appellants seek can only be provided by appropriate amendment to § 85 since, as stated in *Davis v. Elmira Savings Bank,* 161 U. S. 275, 283, 16 S. Ct. 502, 503, 40 L. Ed. 700, 701 (1896),

> "National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and . . . frustrates the purpose of the national legislation . . . ."

As the meaning of 12 U.S.C. § 85 is clear, we must affirm Judge Ross's decree.

*Decree affirmed; appellants to pay costs.*