Dear Commissioners Bartlett and Hergenroeder:
You have requested our opinion whether the Commissioner of Financial Regulation may authorize State-chartered banks to sell insurance directly. Your question results from the fact that federal law grants national banks that authority, and state laws to the contrary are preempted. Barnett Bank v. Nelson,
___ U.S. ___, 116 S. Ct. 1103 (1996). See 81 Opinions of the AttorneyGeneral ___ (1996) [Opinion No. 96-032 (September 26, 1996)].
Our opinion is that the Commissioner of Financial Regulation may approve the application of State-chartered banks to sell insurance directly. After this approval, State-chartered banks would be subject to regulation by the Maryland Insurance Commissioner in the sale of insurance, just as the Insurance Commissioner regulates the sale of insurance by national banks.
 I Background
A provision of the Insurance Code, Article 48A, § 168(e), generally prevents banks from selling insurance directly. The bank itself could not meet the statutory qualification that it "[b]e primarily engaged in the insurance business." Article 48A, § 168(e)(2)(i). As our prior opinion explained, this State law restriction may not be applied to national banks, because it is preempted by a federal law authorizing national banks to sell insurance from small-town locations. See Opinion No. 96-032, at 4.
The federal statute resulting in this preemptive effect does not apply, of course, to State-chartered banks. Therefore, Article 48A, § 168(e) would continue to prohibit State-chartered banks from selling insurance directly unless some other provision of State law authorized that activity.
 II The "Wild Card" Statute
A. Statutory Text
Section 5-504(a) of the Financial Institutions ("FI") Article, colloquially called the "wild card" statute, provides as follows: "Notwithstanding any other provision of Titles 1 through 5 of this article, if the Commissioner [of Financial Regulation] approves, banking institutions may engage in any additional banking activity or bank-related service in which, under federal law, national banking associations may engage." The term "banking institution" means a State-chartered bank. FI § 1-101(d).
The term "notwithstanding" generally means "without prevention or obstruction from or by, or in spite of," the provisions of law listed after the word "notwithstanding." Kingv. Sununu, 490 A.2d 796, 800 (N.H. 1985). See also, e.g.,Theodore Roosevelt Agency, Inc. v. General Motors AcceptanceCorp., 398 P.2d 965, 966 (Colo. 1965); Williamson v. Schmid,229 S.E.2d 400, 402 (Ga. 1976); Missouri Pac. R. Co. v. Rental Storageand Transit Co., 524 S.W.2d 898, 908 (Mo.App. 1975). Thus, ordinarily, only the provisions after the word "notwithstanding" are to be disregarded when considering the statute in which the "notwithstanding" clause appears. See City of Seattle v.Ballsmider, 856 P.2d 1113, 1115 (Wash.App. 1993).
Under that approach to the statute, one would construe FI § 5-504(a) to mean that State-chartered banks may engage in the same banking activities or bank-related services that national banks engage in, in spite of any omission of authority or even the presence of a prohibition in FI Titles 1 through 5. Under this construction, however, a prohibition elsewhere in the Maryland Code would remain applicable, for it would not be the object of the preposition "notwithstanding."
Indeed, a prior opinion of this office reflects exactly this interpretation. In 58 Opinions of the Attorney General 34 (1973), Attorney General Burch was asked whether State-chartered banks could charge the maximum rate of interest permitted by the Maryland Small Loan Law. This question followed a decision by the Court of Appeals that national banks were authorized to charge the maximum rate of interest allowed by that law. See Commissioner ofSmall Loans v. First National Bank of Maryland, 268 Md. 305,300 A.2d 685 (1973).
Attorney General Burch concluded that State-chartered banks were not permitted to charge that rate of interest. In reaching this conclusion, the Attorney General considered the predecessor to FI § 5-504(a), containing substantively the same language: "Any bank . . . is authorized and empowered, notwithstanding the restrictions and limitations imposed in this Article, to . . . engage in any additional banking activity or bank-related service, under the same conditions, limitations, restrictions and safeguards as are . . . applicable, or permitted under federal law to any national [bank]. . . ." Former Article 11, § 67. Attorney General Burch observed that "[t]he express language of the statute limits the restrictions, and limitations which can be waived to those which are `imposed in this Article' (Article 11)." 58Opinions of the Attorney General at 36. The Attorney General then pointed out that the interest rate limitation applicable to the consumer loans in question was set forth in another part of the Maryland Code. "There is no indication in Section 67," observed the Attorney General, "that any restrictions other than those imposed by Article 11 can be overcome pursuant to its provisions." Id.
If this construction of the statute were applied to the present problem, State-chartered banks would not be permitted to sell insurance directly, because the prohibition against their doing so appears in the Insurance Code, not in FI Titles 1 through 5. However, we do not accept this excessively rigid construction of the text. As a federal appeals court observed, "courts must discern the meaning of `notwithstanding' from the legislative history, purpose, and structure of the entire statute." Conoco,Inc. v. Skinner, 970 F.2d 1206, 1224 (3d Cir. 1992). When we consider the legislative history and underlying purpose of FI § 5-504(a), we conclude that the "wild card" statute has a broader reach than the literal construction might suggest.
B. Legislative History
The "wild card" statute has evolved over the years, always with the purpose of allowing State-chartered banks to compete more effectively with national banks. In its original form, it dealt exclusively with lending activities. However, in 1969, its coverage was expanded to achieve parity with national banks as to "any additional banking activity or bank-related service." The legislative history makes clear the General Assembly's objective: to enhance State-chartered banks' ability to compete with their national bank counterparts in Maryland.
In 1963, the General Assembly enacted a law that was intended to authorize State banks, in the words of the bill's title, "to make loans under the same conditions and restrictions applicable to national banks, notwithstanding any provisions of the banking law. . . ." Chapter 293 (Senate Bill 26) of the Laws of Maryland 1963. The provision enacted by Chapter 293, codified at former Article 11, § 67, authorized State banks, "notwithstanding the restrictions and limitations imposed in this Article," to make loans under the same conditions as were "applicable or permitted under Federal Law" to national banks.
Because the scope of this early version of the "wild card" law was narrow — limited to loans — the General Assembly presumably was making a precise demarcation when it authorized State banks to match federal banks, "notwithstanding the restrictions and limitations imposed in this Article . . . ." The "restrictions and limitations" affecting loans that were outsideof former Article 11 were few in number: the usury laws in former Article 49, and the Small Loan Law in former Article 58A. The General Assembly apparently intended these laws to remain applicable to State banks, regardless of what federal law authorized national banks to do, and that is what the Attorney General concluded in 58 Opinions of the Attorney General 34.
A major change occurred in 1968, however, and with it a major change in the legislative objective, not adequately reflected in the drafting of the "wild card" law. As federal authorities expanded the range of activities open to federal banks, State regulators and State banks alike grew alarmed at the prospect of migration of State banks to federal charters. In a letter dated July 24, 1968, to then Speaker of the House Marvin Mandel, the Bank Commissioner and Banking Board expressed concern about "the growing and quite disturbing trend nationally for state banks to convert to national charters, with the result that the traditional dual banking system . . . is increasingly falling into the federal orbit." To combat this trend, these banking regulators recommended that the Bank Commissioner be given expanded regulatory authority, to "allow all State banks to have rights equal to those of national banks. . . . All that the State banks want is equality with the national banks . . . ." Id.
In the fall of 1968, the House Economic Affairs Committee held a hearing on the banking regulators' proposal. One supporter of the recommendation was the chairman of the board of a State bank who had previously served for 45 years as the Deputy Bank Commissioner. In recounting the history of the original "wild card" law, limited to loans, he testified "that the amendment was entirely too narrow and should have permitted the Bank Commissioner to issue and promulgate rules and regulations . . . which would permit our State banking institutions to compete with the national banks in this State on equality in all phases of banking." Testimony of John D. Hospelhorn (October 23, 1968). He supported the recommendation because it would have this expansive effect.
The minutes of the committee's hearing reflect uniform testimony that the proposed amendment to former Article 11, § 67 was intended, in the words of one witness, to give State banks "the ability to compete at [the] same level [as federal banks], and these changes would merely repeal present, unfair competitive positions held by federal banks over State banks." Minutes of the 18th Meeting of the Economic Affairs Committee (October 23, 1968).
The bill as enacted, Chapter 495 of the Laws of Maryland 1969, was essentially unchanged from the proposal. Therefore, the views of these supporters are important evidence of the legislative purpose underlying the bill. See Rose v. Fox PoolCorp., 335 Md. 351, 370, 643 A.2d 906, 915 (1994); Board ofTrustees v. Life and Health Ins. Guar. Corp., 335 Md. 176, 200642 A.2d 856, 864 (1994). See also Jack Schwartz and Amanda Stakem Conn, The Court of Appeals at the Cocktail Party: The Use andMisuse of Legislative History, 54 Md. Law Rev. 432, 462 (1995).
Yet this purpose was only partially attended to in the drafting of the amendment. The proponents focused on the need for parity with federal banks for "any additional banking activity or bank-related service," not just loans. But the drafters left intact the original "notwithstanding" clause, "[n]otwithstanding restrictions and limitations imposed in this Article." Restrictions and limitations outside of former Article 11 were seemingly left intact. But, instead of a few laws applying specific limitations to the lending activities of State banks, as had been the case under the 1963 law, under a literal reading State banks would continue to be hobbled in their competition with federal banks by a broad range of laws outside the banking laws. In short, if the "notwithstanding" clause were given literal effect, it would frustrate the purpose of the expanded "wild card" law.
 III Application of "Wild Card" Statute
FI Titles 1 through 5 are silent about the authority of State-chartered banks to sell insurance products directly.[1]
Moreover, FI § 3-206, which establishes the general and specific powers of commercial banks in Maryland, fails to specifically grant insurance powers for these institutions. Were these sections read to prohibit State-chartered banks from selling insurance, State-chartered banks would be at a competitive disadvantage vis-a-vis national banks. It is precisely this kind of imbalance that the "wild card" statute was enacted to cure.
The Insurance Code provision at issue, Article 48A, § 168(e), does not address banks at all. Instead, banks happen to fall within a general category of those who are barred from selling insurance directly. As discussed in Part I above, federal law trumps the State prohibition. If the "notwithstanding" clause in what is now FI § 5-504 were construed too narrowly, the Insurance Code provision would prevent State banks from enjoying exactly what the General Assembly intended to authorize: the opportunity to compete on even ground with federal banks that are allowed by federal law to sell insurance directly.
We shall not construe the text of the statute to defeat its underlying purpose. See, e.g., Romm v. Flax, 340 Md. 690,668 A.2d 1 (1985). In our view, the Commissioner may apply the "wild card" statute to allow State banks to engage in an activity open to federal banks under federal law, even if the activity is not authorized (or is prohibited) by FI Titles 1 through 5 and even if the activity is not authorized (or is prohibited) by a law outside FI Titles 1 through 5. The "wild card" statute does not apply, however, if the activity itself is one traditionally engaged in by State banks — that is, is not an "additional banking activity or banking-related service" — and the General Assembly has expressly prohibited or limited that activity in a law outside FI Titles 1 through 5.
Because 58 Opinions of the Attorney General 34 dealt with such an exceptional situation, we believe that the opinion's conclusion was correct. In that situation, the national bank power desired for State-chartered banks was derived from a specific State statute, not from federal law. That statute expressly excluded its use by State-chartered banks. Thus, when a State-chartered bank tried to "step into the shoes" of the national bank under the "wild card" statute, it found itself subject to a law that banned its use by State-chartered banks.
Article 48A, § 168(e) is a general prohibition and is not specifically directed at banks. Accordingly, the general prohibition in § 168(e) should not be read to override the Commissioner's specific authority as granted in the "wild card" statute.[2]
Thus, it is within the authority of the Commissioner of Financial Regulation to approve a "wild card" application by a State-chartered bank to engage in the business of selling insurance products, on the same basis as national banks. An approval of this kind must be consistent with the requirements of FI § 5-504(b).[3]
 IV Conclusion
In summary, it is our opinion that the Commissioner of Financial Regulation may authorize a State-chartered bank to engage in the direct sale of insurance, subject to the requirements of FI § 5-504.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
 Thomas L. Gounaris Assistant Attorney General
[1] FI § 5-403 specifically permits a banking institution to offer financial, fiduciary, or insurance services through an affiliate. There is no indication, however, that these activities may be conducted only through an affiliate or subsidiary. Because these categories encompass virtually every activity of a bank, the authority to conduct them through an affiliate or subsidiary must be seen as permissive rather than mandatory.
[2] Our conclusion is reinforced by the fact that the Insurance Code provision was enacted in 1967, two years before the expansion of the "wild card" statute. See, e.g., CriminalInjuries Compensation Board v. Gould, 273 Md. 486, 494,331 A.2d 55 (1974) ("Where two statutes relate to the same general subject matter . . . to the extent of any conflict between them, the later statute governs.").
[3] The Commissioner of Financial Regulation may approve an additional activity or bank-related service only if the approval is reasonably required to protect the welfare of the general economy of this State and of banking institutions and is not detrimental to the public interest or to banking institutions. In addition, the approval is to impose the same conditions that federal law requires or permits as to national banks.
 *Page 58