TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant, v. RALSTON-PURINA COMPANY.—No. 38761.—180 S. W. (2d) 693.

Division One, May 2, 1944.

Rehearing Denied, June 5, 1944.

*Joseph A. McClain, Jr.,* and *Arnot L. Sheppard* for appellant.

1014

*John F. Evans* for respondent.

**1016**

BRADLEY, C.—Action on an indemnity contract to recover $20,094.95. Cause was tried to the court without a jury. Finding and judgment went for defendant and plaintiff appealed.

Defendant, respondent here, is engaged in the processing of foods and has a plant, in St. Louis, which requires the use of switch tracks upon which to move cars to and from its premises. Plaintiff, appellant here, is a railroad company and one of its functions is to switch cars from connecting carriers to industrial plants in St. Louis. In 1890, defendant's predecessor in title, constructed an elevator building on the plant premises, and, on the east side of the building, there is what is called the tunnel which extends north and south through the building. In 1906, railroad tracks were constructed (by defendant's predecessor in title, we infer) through the tunnel. September 22, 1926, plaintiff entered into the indemnity contract with the Checkerboard Elevator Company (defendant's predecessor). In 1936, defendant assumed all obligations of the Checkerboard Elevator Company under the indemnity contract. In the contract, except in the preliminary paragraph, plaintiff is referred to as the Railroad, and the Checkerboard Elevator Company as the Industry. The Third, Fifteenth, and Twentieth paragraphs of the contract provide:

"Third. The Industry shall: (a) Furnish and maintain a roadbed with alignment and grades, and otherwise satisfactory to the Engineer of the Railroad, or his authorized representative, hereinafter designated Engineer, without any buildings, poles or other obstructions of any kind within eight (8) feet six inches along tangents, and nine (9) feet six (6) inches along curves on either side of the center line of the Industrial track, and for twenty-two (22) feet above top of rails . . . ."

"Fifteenth. The Industry shall save and hold harmless the Railroad from all loss, damage, injury or death caused by obstructions being closer to the Industrial track than specified herein."

"Twentieth. The Industry shall reimburse the Railroad for all expenses caused by violation of any of the above covenants, agreements, terms or conditions, including reasonable fees of attorneys, or money expended or incurred in legal proceedings, brought by claimants to recover damages for any matter connected with, incident to, or growing out of this agreement."

The distance (at the point here involved) from the center line of the east track in the tunnel to the east wall thereof was 5 feet and 5 inches, which left only 11 inches clearance from the line of a boxcar overhang to the east wall.

August 8, 1940, plaintiff's switching crew, Charles C. Uhl, foreman, was engaged in spotting a car on the east track in the tunnel. The car, the rear of a tow of 3 cars, was pushed (engine headed north) into the tunnel from the south. It was Uhl's duty to uncouple the car, to be spotted, which was stopped with the south end even with a window in the east side of the tunnel. To uncouple the car, Uhl stepped through the window and between the car to be spotted and the one in front; pulled the pin; signaled to a switchman, outside and opposite the window, who relayed the signal to the engineer. "The knuckle lock hung", and the cars failed to uncouple when the pin was lifted, and when, in response to the signal, the cars, including the one to be spotted, moved south Uhl was in some way caught between the east side of the car and the window ledge and was killed.

Uhl's widow, as administratrix, brought suit against the Terminal (appellant here) under the Federal Employers Liability Act (45 U. S. C. A., Secs. 1-50). The Terminal notified defendant of the suit, advised that it (Terminal) would expect to be indemnified under the contract, etc. Defendant did not consider itself liable to Terminal under the contract for any damages that Uhl's widow might recover, and did not respond to Terminal's notice. Notwithstanding defendant's failure to respond, it was kept informed as to the suit's progress. Finally, the Uhl suit was settled by Terminal paying the widow $20,000. Thereafter, the present cause was filed.

Defendant, in effect, makes two contentions: (1) That the indemnity contract is ambiguous, and that in view of the situation obtaining at the time of its execution, a fair construction would be that the clearance provision in the third paragraph was not intended to apply to clearance *in* the tunnel; and (2) that, if applicable to clearance in the tunnel, the contract does not require defendant to reimburse plaintiff for a loss caused by its own negligence.

Does the clearance provision in the third paragraph of the indemnity contract apply to the track in the tunnel? It will be noted that in this paragraph it is provided that the "Industry (defendant) shall furnish and maintain a *roadbed* . . . without any buildings, poles or other obstructions" within 8 feet 6 inches, or 9 feet 6 inches "of the center line of the *Industrial* track" (italics ours). Defendant argues that the term *roadbed* in the third paragraph has reference to the track *outside* the tunnel. In the brief, defendant says:

"The third paragraph does not say in so many words that a clearance of eight feet, six inches shall be maintained along the entire length of the industrial track. It says that the industry shall furnish and maintain a *roadbed,* with certain clearances on either side of the *Industrial track.* Now we have no doubt that the term *roadbed* has a precise meaning to a railroad construction engineer, but the ordinary business executive might not have the same definition of the word in mind. Indeed, the language as used would indicate that the

roadbed was not coextensive with the entire trackage; otherwise why would the agreement speak of *roadbed* clearances, rather than clearances along the entire industrial track. The term Industrial track is defined (first paragraph of contract) as '*including all* connections, frogs, switches, derails, crossings or special track work, interlocking work, signals and safety appliances appertaining thereto', and the location and length of the track is precisely set out. No such elaborate definition of the term *roadbed* is given; in fact, its meaning is not defined in any manner. We think that any reasonable construction of the language would require an assumption that *roadbed* refers to the open track outside of permanent buildings and other structures, while the term *industrial track* 'refers to the entire length of trackage'' (italics our emphasis in the quote).

The railroad track here concerned was in the tunnel and in the same position as at present with reference to the east wall when the contract was executed, and had been for some 20 years. If it was not intended to include the track in the tunnel within the indemnity contract, certainly such could have been definitely stated. We think it quite plain that the indemnity contract covered the track in the tunnel.

Does the indemnity contract cover the loss sustained by plaintiff becaues of Uhl's death? Defendant says: ''The real· question in the case is whether or not'the language of the indemnity clause clearly requires the industry (defendant) to assume the legal liability of the railroad (plaintiff) resulting from railroad's own violation of the federal laws concerning safety appliances, simply because the lack of clearance in the tunnel may have .contributed to cause the accident, or because the lack of clearance combined with railroad's violation of law to produce the full extent of the damages.''

''It is well settled that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. Public policy has been said to require such contracts to be restricted rather than extended, and the liability of the indemnitor is regarded as so hazardous, and the character of the indemnity so unusual, that there can be no presumption that the indemnitor intended to assume it in the absence of express stipulation.'' 27 Am. Jur., Indemnity, Sec. 15, p. 464.

As to whether an indemnitee can recover for losses caused by his own negligence depends on the language of the indemnity contract and what may be termed the subject matter thereof. A contract which undertakes to indemnify against the consequences of an act which is illegal, because against positive law or public policy is void, Harrington v. Crawford, 136 Mo. 467, 38 S. W. 80; Rice Bros. & Nixon v. National Bank of Commerce, 98 Mo. App. 696, 73 S. W. 930; 31 C. J:, Sec. 17, p. 425, but it is not contrary to any positive law or

public policy for an indemnitee to contract with an indemnitor to save him harmless, as to third persons, even though the loss sustained was the result of his own negligence or that of his servants. 31 C. J., Sec. 16, p. 425; Kansas City, Memphis & Birmingham R. Co. v. Southern Ry. News Co., 151 Mo. 373, 52 S. W. 205, 45 L. R. A. 380. The ruling in the case last cited was criticized in Breeden v. Frankfort Marine, etc., Ins. Co., 220 Mo. 327, l. c. 371, 119 S. W. 576, l. c. 588, but see "separate majority opinion", 220 Mo. 423, l. c. 428-9. In fact, all liability insurance policies protect an indemnitee against his own negligence, and plaintiff, in effect, treats the present indemnity contract as insuring it against loss, even though caused, in part, by its own negligence, if such loss was *caused*, within the meaning of that term in the contract, by obstruction being closer to the track than specified in the contract.

All italics, hereinafter, are ours unless otherwise stated. It will be noted that the Fifteenth paragraph of the indemnity contract provides that the "Industry shall *save and hold harmless* the Railroad from *all* loss . . . *caused* by obstructions being closer" to the track than specified in the contract, and that the Twentieth paragraph provides that "the Industry shall reimburse the Railroad for *all* expenses *caused*" by the violation of the provisions of the contract.

 Was Uhl's death and plaintiff's loss *caused* by lack of clearance within the meaning of the term *caused* in the indemnity contract? Avery v. American Automobile Ins. Co. et al., 350 Mo. 395, 166 S. W. (2d) 471, was an action on a liability insurance policy. Avery, prior to securing the American policy, had procured from the Hartford Company a policy which indemnified him against loss "caused by equipment rented or leased by the assured to contractors", and there was a provision in the American policy, the one sued on, that if Avery had *other insurance* covering the loss sued for, then he could not recover on the American policy. The American Company contended that Avery had such other insurance, and for that reason, could not recover. Avery contended that the Hartford policy did not cover the loss. The facts were these: Avery leased a pump to a construction company and delivered it. While unloading the pump from Avery's truck, a skid sagged and the pump fell from the skids and Walsh, an employee of the construction company, was injured. Walsh sued Avery. Both insurance companies denied liability. Avery settled the Walsh suit and then sued the American Company and contended that the Hartford policy covered injuries resulting only from defects in the leased equipment, the pump, and that the *proximate cause* of the pump's fall and Walsh's injury was not any defect in the pump, but was the sagging of the skids, and that therefore, Walsh's injury was not *caused* by the rented or leased pump. It was held that the Hartford policy covered Walsh's injury, and that Avery therefore,

had other insurance, and could not recover from the American Company.

In the present case, we think that the lack of clearance between the east wall of the tunnel and the railroad tack was a *cause* of plaintiff's loss (damages paid for Uhl's death) within the meaning of the term *caused* in the Fifteenth paragraph of the indemnity contract, and so rule. See Dolph v. Maryland Casualty Co., 303 Mo. 534, 261 S. W. 330; Quality Dairy Co. v. Fort Dearborn Casualty Co. (Mo. App.), 16 S. W. (2d) 613, 614; Owens et al. v. Ocean Accident & Guaranty Corp., 194 Ark. 817, 109 S. W. (2d) 928; Mullen v. Hartford Accident & Indemnity Co., 287 Mass. 262, 191 N. E. 394; Fitzgerald v. Milwaukee Automobile Ins. Co. et al., 226 Wis. 520, 277 N. W. 183. These cases are cited and reviewed in the Avery case, supra.

 Should plaintiff be denied recovery because its loss was due, at least in part, to its own negligence, that is, the violation of the Safety Appliance Act? In St. Louis & Suburban Ry. Co. v. Stewart et al. (Mo. Sup.), 187 S. W. 836, the plaintiff and the defendants entered into a contract whereby the defendants were to construct for the plaintiff certain coal bins and chutes near plaintiff's power house. The defendants sublet the structural steel work under the contract to the Union Iron & Foundry Co. Clark, an employee of the Union Company, under the direction of his foreman, and in the course of his work, ascended a pole on which were plaintiff's highly charged wires, was shocked and severely injured. Clark sued both the Railway Company and his employer, the Union Company, and recovered a judgment against the Railway Company for $20,000. The Railway Company paid the judgment and brought suit against Stewart et al., the coal bins and chutes contractors. The suit was on the theory that the provision of the contract upon which the Railway Company relied was, in effect, liability insurance, and was as follows: "The contractor (Stewart et al.) shall assume *all* risk of accident to materials, workmen or persons engaged in or about the building . . . ."

It was held [234 Mo. 396, 137 S. W. 583] that it was the duty of the Railway Company to furnish the Union Company and its employees a reasonably safe place to work, and it was for a breach of that duty that the Railway Company became liable to Clark. In other words, the negligence of the indemnitee was one of the concurring causes of Clark's injury. And, it was held that the provision of the building contract relied on was a contract of insurance. The court said [187 S. W. l. c. 839]:

"Had it not been for the contract of insurance or indemnity before mentioned, by which the defendants agreed to 'assume *all* risks of accident to materials, workmen, or persons engaged in or about the building', etc., they clearly would not have been liable to plaintiff

for the injuries sustained by Clark, because the injuries were caused by its own negligence, as before stated, in not having furnished him with a reasonably safe place in which to work. It was for that very reason that the contract of indemnity between the plaintiff and defendants was executed."

In Buckeye Cotton Oil Co. v. Louisville & Nashville R. Co. (6th Cir.), 24 Fed. (2d) 347, the Railroad Company constructed for the Oil Company some industrial tracks to be used by the Railroad Company as loading and unloading tracks for the Oil Company. The Oil Company agreed "to place no overhead structure lower than 20 feet above the tops of the rails . . . and to keep the tracks free from obstructions", and agreed to hold the Railroad Company "harmless from the claims and demands of any and all persons on account of any damages or injuries *caused* directly or indirectly by the existence, location, or condition of any structure or obstruction of any kind on the premises of the second party (Oil Company) or by any obstruction on said tracks." The Oil Company erected a scaffold over two of the tracks and while the Railroad Company was switching a cut of cars on one of these tracks, a car struck a scaffold support, which fell and injured a workman of the Oil Company (appellant's counsel say the record in the case shows the injured workman was an Oil Company workman; the opinion does not say). The workman sued the Railroad Company and recovered a judgment which the Railroad Company paid. The Railroad Company then sued the Oil Company for indemnity under the clause above set out. The lower court directed a verdict for the Railroad Company. The Oil Company appealed, and contended "that the negligence of the train crew was the sole proximate cause of the accident, and that the contract sued on did not indemnify the plaintiff (Railroad Company) against damages resulting from the negligence of its own employees." The judgment of the lower court was affirmed. The court said:

"There was no rule of public policy which forbade the railroad company from contracting with the oil company for indemnity against any damages which the railroad might be required to pay as the result of the ordinary negligence of its employees in operating engines and cars on these tracks. Insurance Co. v. Railway Co., 175 U. S. 91, 20 S. Ct. 33, 44 L. Ed. 84; Railway Co. v. Grant Bros., 228 U. S. 177, 33 S. Ct. 474, 57 L. Ed. 787; Carbon Co. v. Railroad Co. (C. C. A.), 15 Fed. (2d) 802. It is said, however, and rightly so, that a contract will not be so construed, unless it was clearly intended to have that effect. This, of course, does not mean that the intention must be expressed in terms, but that, if not so expressed, it must otherwise clearly appear in the language used."

It will not add to the law to review other cases. We think that the language of the present contract is such that it is susceptible of only one reasonable construction, and that is that it covers the loss

sustained by plaintiff in the Uhl case, even though that loss was caused in part by plaintiff's (indemnitee's) own negligence. The judgment should be reversed and the cause remanded with directions to enter judgment for plaintiff for the amount sued for. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.