MISSOURI PACIFIC RAILROAD COM-
PANY, a corporation, Plaintiff-Respon-
dent and Appellant,

v.

RENTAL STORAGE & TRANSIT COM-
PANY, a corporation, and General Ware-
house Corporation, Defendants-Appel-
lants and Respondents,

and

Frank Lyon Company, Missouri, a
corporation, Defendant.

Nos. 9296, 9297.

Missouri Court of Appeals,
Springfield District.

June 4, 1975.

Thomas G. Strong, William J. Hart, Farrington, Curtis & Strong, Springfield, for Missouri Pacific Railroad Co.

Meredith B. Turner, Turner, Reid & Duncan, Springfield, for Rental Storage & Transit Co. and General Warehouse Corp.

*HOGAN, Judge.*

In this bench-tried action upon the indemnity provisions of a spur track agreement, plaintiff (Railroad) has had judgment against defendants Rental Storage and Transit Company and General Warehouse Corporation (collectively Industry) in the amount of $63,500 plus $1,000 as attorneys' fees with interest on both sums from June 25, 1965.[1] Industry appeals from the judgment allowing reimbursement; the Railroad also appeals, claiming it is entitled to additional attorneys' fees. The appeals have been consolidated by our order.

On March 29, 1965, one of the Railroad's switch crews was spotting a loaded car at a warehouse owned by defendant Rental Storage Company. The Railroad's employee Clyde Johnson was caught between the boxcar and a loading dock and sustained fatal injuries. Very shortly thereafter, Johnson's widow asserted a wrongful death claim against the Railroad under the Federal Employers' Liability Act, 45 U.S.C.A.

---

1. The Frank Lyon Company, General Warehouse's lessee, was originally joined as a party, but a separate trial of the Railroad's claim against Industry was ordered pursuant to Rule 66.02, V.A.M.R., *and the judgment entered was specifically designated a* final and appealable judgment as permitted by former Rule 82.06, which was then in effect. References to statutes and rules are to RSMo 1969, V.A.M.S., and V.A.M.R., except where otherwise indicated.

§§ 51–60. The Railroad notified Industry of the accident and of the assertion of Mrs. Johnson's claim, advising Industry that "[t]he factual circumstances . . . are such that the railroad may be liable". Industry was called upon to defend or settle the claim and was advised that compromise settlement negotiations had been begun. The Railroad offered to discuss the negotiations with Industry, or to carry them to a conclusion in Industry's name or for its account. Industry declined to assume defense of the claim. Mrs. Johnson agreed to accept $63,500 in full settlement of her claim, and the Railroad again notified Industry, calling upon Industry to defend or settle the claim. Industry again refused, the Railroad paid $63,500 in settlement of the claim, and this action followed.

■ Two or three preliminary observations seem appropriate. First, the record is rather involved, consisting as it does of some 632 pages of formal transcript into which 96 separately numbered exhibits, ranging from a roll of motion pictures to an attorney's "doodle pad", have been incorporated. The appeals have been meticulously presented; the parties' combined briefs run to some 165 pages. For the most part, the parties' briefs seem to be correlated with the trial court's findings of fact and conclusions of law, which upon transcription run to 18 typewritten pages, and counsel have selectively adopted and rejected these findings as they serve their particular points of view. We acknowledge the utility of the trial court's extensive analysis of the case and counsel's careful preparation, but we conceive it to be our duty to review the case on both the law and the evidence, reaching our own conclusions. Paro v. Pennsylvania R. R. Co., 348 S.W.2d 613, 616[1] (Mo.App. 1961). And, to the extent possible, we have confined ourselves to a recitation of those facts and a consideration of those issues essential to an orderly disposition of the appeals. Bloomfield Reorganized School Dist. No. R–14 v. Stites, 336 S.W.2d 95, 97 (Mo.1960); Southwest Engineer. Co. v. Reorganized School Dist. R–9, 434 S.W.2d 743, 746 (Mo.App.1968).

On January 2, 1962, Industry and the Railroad executed a spur track agreement, entitled "Industrial Track Agreement", in which it was agreed Industry would be served by a 251-foot end section of one of the Railroad's existing tracks in the city of Springfield, Missouri. The agreement contains two indemnity clauses but the one with which we are primarily concerned reads:

"3. Shipper [Industry] shall not erect or maintain, or allow to be erected or maintained, any building, structure or fixture, or place or store, or allow to be placed or stored material, equipment or obstruction of any kind, over or adjacent to Switch [the track and adjacent roadway] at distances less than those prescribed by competent public authority; and in no event shall any such building, structure, fixture, material, equipment or obstruction be erected, maintained, placed or stored at a height less than twenty-five feet above nearer rail, or at a distance less than eight and one-half feet from the center line, of Switch; provided: . . . (ii) the horizontal minimum clearance with respect to curve tracks shall be increased one-half inch for each degree of curvature, and (iii) loading platform of car floor height may be constructed with a horizontal clearance which is not prohibited under clearance regulations established by competent public authority and which shall have the approval of [Railroad's] Chief Engineer. [Industry] assumes full responsibility for, and shall *defend*, indemnify and save harmless the [Railroad] from and against, any and all *liability, suits, claims, damages, costs* (including attorneys' fees), *losses, outlays,* and *expenses in any manner caused by, arising out of or connected with* the failure or refusal of [Industry] to comply with, observe or perform any

of the provisions of this covenant, notwithstanding any possible negligence (whether sole, concurrent or otherwise) on the part of the [Railroad], its agents or employes [sic]." (Our emphasis)

On March 29, 1965, one of the Railroad's switch crews was called upon to spot a loaded car at Industry's warehouse adjacent to the spur track. There were four men in the switch crew: Burton Painter, who supervised spotting operations, Charles Hogan, an engineer, and John Gray and Clyde Johnson, who assisted the foreman in spotting cars, cutting off cars and setting handbrakes. Gray was called the "head man"; he worked closest to the engineer. Johnson, the "field man", worked at the end of the tow. As the term is used here, "spotting" a car means aligning the door of the car with the door of Industry's warehouse. The warehouse door opens onto a loading dock which protrudes from the warehouse toward the spur so a boxcar can be loaded or unloaded directly onto the dock. The spotter working as a "field man" would stand on the side of the dock nearest the switch engine and as close to the building as possible, so, as the foreman put it, "he would be in the position where he could spot the car better and could line the door [of the car] up with the dock or the platform and . . . be in a position where the engineer could see him better."

Industry's warehouse is located on the north side of Walnut Street in the city of Springfield, Missouri. Walnut runs east and west; the Railroad's spur at the particular point in question [2] crosses Walnut at right angles from the south and extends some 190 feet north along the west side of the warehouse. About 28 feet north of the southwest corner of the warehouse, on the west side, there is a 10-foot door which opens onto a wooden loading dock. This loading dock, referred to as the south dock,

is the structure against which Johnson was crushed.

Two important issues were tendered in connection with the horizontal clearance between the warehouse and the spur. The Railroad claimed, and its proof tended to show, that the horizontal clearance between the warehouse and the spur was insufficient to comply with the requirements fixed by the Public Service Commission. The trial court found that the west edge of the dock was at least 5 feet 9 inches from the center of the spur, the minimum clearance permitted, and the record justifies that conclusion. Further in connection with the clearance between the building and the spur, the Railroad's evidence indicated that at the time the accident occurred, large wooden frames, referred to as "bulkheads" or "dividers", were leaning against the west wall of the warehouse immediately south of the dock. The Railroad's evidence further indicated, and the trial court found, that this heavy wooden dunnage was stacked or piled against the building so it extended outward from the west wall of the warehouse to a point 6 feet 1 inch east of the center line of the spur. The trial court found that these "bulkheads" or "dividers" had been piled against the warehouse by Industry's lessee; that finding is not challenged here.

About 4:00 p. m. the switch crew arrived in the vicinity of the warehouse. Their instruction was to spot a loaded car at the south dock. There was an empty car at the dock. The empty car was removed from the south dock by coupling it to the switch engine, then "backing" or moving south across Walnut over a switch some distance to the south. There the car to be spotted was picked up from another sidetrack by coupling it to the empty car. The crew also coupled an empty tank car to the "rear" or south of the switch engine, and started to

---

2. The spur is in fact part of a system of switches, spurs and sidetracks which serves shippers in the west part of Springfield.

proceed north across Walnut. At this point the train consisted of the loaded car (to be spotted) in "front" or at the north end, then the empty car, then the switch engine with the empty tank car in the "rear", i. e., to the south. The train moved north across Walnut at a speed estimated to be between two and three miles per hour.

As the train moved north across Walnut, Johnson was flagging traffic on Walnut north of the train. Painter, the foreman, climbed to the top of the loaded car to set the handbrake. Gray, the other "helper" was south of the engine on the east side of the train, walking north. After Painter set the handbrake, he "got off" the loaded car "at the north edge of Walnut Street." Johnson was then "about halfway between the north side of Walnut Street and [the south] dock." Johnson was walking north. The last time Painter saw Johnson before the accident, Johnson was a short distance north of the southwest corner of the warehouse, between the train and the warehouse. Painter did not see how Johnson became caught between the train and the dock; his statement on trial was, "As I had walked back out into Walnut Street I heard Mr. Johnson holler . . . and I looked around and saw him pinned between the car and the dock." Painter then gave a "stop signal", ran to Johnson, and found Johnson caught between the dock and an upright brace attached to the north end of the door runner on the east side of the loaded car. Painter went into the warehouse, tried to find a wrecking bar "or a bar of some kind", and returned to the dock. An attempt was made to extricate Johnson by using a hydraulic jack wedged between the dock and the loaded car, but that attempt failed, and it became necessary to cut part of the dock away with a chain saw in order to free him. There is nothing in the record to indicate how Johnson became caught and wedged between the boxcar and the dock; no one present heard him say anything except "get me out of here"; his medical record indicates that he "could respond" after the accident, but shows only that he said "his chest and back were painful." Johnson died of his injuries at 10:06 p. m.

Both Painter and Hogan, the engineer, testified that "lumber" or "bulkheads" obstructed the passage between the west side of the warehouse and the train. Basing his testimony on his observation of a roll of motion pictures made immediately after the accident, Painter gave as his "judgment" that the dunnage was closer to the track when the accident happened than it was when the Railroad's measurements were made.

It is admitted in this court that Johnson's wife asserted a wrongful death claim against the Railroad under the F.E.L.A. and that the basis of her claim was that the Railroad failed to furnish Johnson with a reasonably safe place to work because of the presence and location of the dunnage. Industry further admits it was notified of the assertion of the claim, that the Railroad requested Industry to assume responsibility for the defense or settlement of the claim, and that Industry refused. Industry further concedes that the Railroad negotiated a compromise settlement of the claim and paid the sum of $63,500 to Johnson's widow. It is admitted that indemnity was demanded and that Industry refused.

We first consider Industry's arguments that a proper construction of the contract limits Industry's liability to its own acts or omissions and that the judgment is erroneous because Industry itself neither placed the dunnage near the spur nor "allowed" it to remain there. Our attention is called to the first part of the first sentence in paragraph three of the spur track agreement, specifically:

"3. Shipper shall not erect or maintain, or allow to be erected or maintained, any building, structure or fixture, or place or store, or allow to be placed or stored material, equipment or obstruction of any kind,

over or adjacent to Switch at distances less than those prescribed by competent public authority; and in no event shall any *such* building, structure, fixture, material, equipment or obstruction be erected, maintained, placed or stored . . . ."

Industry, citing a number of cases, advises us that the adjective "such" appearing as the seventh word of the second independent clause in the first sentence of paragraph three is the equivalent of "before-mentioned; previously characterized or specified" thereby limiting Industry's liability to its own, proper acts. There is no doubt that the word "such" in the second clause means "as defined above",[3] but the conclusion Industry asks us to draw is wholly unsound.

■ The spur track agreement, like other written contracts, must be construed as a whole in light of the object, nature and purpose of the agreement. Wilshire Const. v. Union Elec. Co., 463 S.W.2d 903, 906[3] (Mo.1971); Brackett v. Easton Boot and Shoe Co., 388 S.W.2d 842, 848[5] (Mo.1965). The instrument before us is relatively simple. It provides 1) that Industry "shall be served" by the northerly 251 feet of an existing track, which is identified by reference to a map; 2) that the Railroad may use the switch (track and roadway) when that is "not unnecessarily detrimental to [Industry]"; 3) that the Switch shall be maintained (except for planking and paving) by the Railroad and Industry shall pay 20 cents per foot of track annually for use of the switch. The instrument then recites

two covenants for indemnity, one of which has been set out, and concludes by providing that the contract may be terminated by either party on 30 days written notice; that "no right of [Industry] shall be transferred or assigned, either voluntarily or involuntarily, except by agreement acceptable to [the Railroad]", and that either party may waive any default of the other without affecting any subsequent default. The nature and purpose of such agreements, including the indemnity provisions, have been extensively discussed elsewhere; we need not restate general principles.[4] In broad terms it was Industry's purpose, as an interstate shipper, to obtain the use of a railroad siding; the Railroad, as a condition to furnishing the service, sought indemnity against its nondelegable statutory duty to provide its employees with a safe place to work. More specifically, we construe paragraph three as a covenant on Industry's part to maintain minimum lawful clearances as prescribed by the Public Service Commission; it is in legal effect a covenant to maintain a particular status, capable of measurement, and to indemnify against all liability or loss (or perhaps both) arising out of the failure to maintain that status. See Kansas City Power & Light Co. v. Federal Const. Corp., 351 S.W.2d 741, 747 (Mo.1961), construing the spur track agreement discussed in Terminal R.R. Ass'n of St. Louis v. Ralston-Purina Co., supra n. 4, 352 Mo. 1013, 180 S.W.2d 693. Moreover, and contrary to the parties' positions here, the contract specifically prohibits assignment of Industry's interest, whether it is properly a

---

3. Sir Ernest Gowers refers to the adjective "such" in this context as "the defining such", used "to avoid ambiguity without having to repeat the defining words". Fowler, Modern English Usage, p. 602 (Gowers ed. 1965). According to the Oxford Concise Dictionary, p. 1289(4) (5th ed. 1964), it is the equivalent here of "the aforesaid, of the aforesaid kind"; the meaning indicated in Webster's New International Dictionary, p. 2518(5) (2d ed. 1955), is quoted: "[b]efore-mentioned; previously characterized or specified".

4. See, e. g., Tri-State Gas Co. v. Kansas City Southern Ry. Co., 484 S.W.2d 252 (Mo. 1972); Terminal R.R. Ass'n of St. Louis v. Ralston-Purina Co., 352 Mo. 1013, 180 S.W.2d 693 (1944); Kansas City, M. & B. R.R. Co. v. Southern Ry. News Co., 151 Mo. 373, 52 S.W. 205, 45 L.R.A. 380 (1899); Paro v. Pennsylvania R.R. Co., supra, 348 S.W.2d 613; generally see Annot., 20 A.L.R.2d 695 (1951); 65 Am.Jur.2d Railroads §§ 209, 210, pp. 461–463 (1972).

species of leasehold or a type of license, without the Railroad's consent.

The whole thrust of Industry's two points based on its construction of the contract is that it cannot be held liable because it had sublet the warehouse, or part of it, to a corporation known as the Frank Lyon Co. Missouri, the Frank Lyon Co. had agreed, as the evidence shows, to indemnify Industry and the "owner of said premises" against claims for personal injuries "arising out of the use and occupancy" of the premises by Lyon, and the trial court found as a fact that the dunnage in question was piled against the west wall of the warehouse by Lyon's employees. There is no claim of novation between the Railroad and Lyon, and no record evidence indicates the Railroad's consent to an assignment of the legal duty imposed on Industry by the indemnity provisions of the spur track agreement.

■■ Reduced to its essence, then, Industry's argument is that by assigning its interest in the spur track agreement, and delegating the performance of its legal duty to indemnify the Railroad, it divested itself of that duty. It would be fortunate for many of us, overburdened with obligations, if such were the law. It is, however, one of the most elementary principles of the law of contracts that neither a delegation of performance by an obligor, nor a contract with the obligor by the person to whom the performance is delegated to assume the obligor's duty, extinguishes that duty or prevents recovery of damages from the obligor if the duty is not performed. Restatement of Contracts § 160(4), pp. 197–198 (1932); 4 Corbin, Contracts § 866, p. 452 (1951); 2 Williston, Contracts § 411, p. 1172 (Rev. ed. 1936). Ignoring for the moment

that Industry's right to use the spur track was not assignable, it could not divest itself of its duty to indemnify the Railroad by assigning its interest to Lyon, even though Lyon in turn contracted to hold the "owner of said premises harmless from any and all claims for injuries or damages to persons . . . on, in or about the premises".

A further contention made by Industry is that the indemnity provisions of the spur track agreement are void and unenforceable because they permit the Railroad to be indemnified against the consequences of its own illegal acts. In support of this argument Industry cites § 389.797 [5] and seizes upon certain language found in Terminal R.R. Ass'n of St. Louis v. Ralston-Purina Co., supra n. 4, 352 Mo. at 1018, 180 S.W.2d at 695[2], to the effect that a contract which undertakes to indemnify against the consequences of an act which is illegal because of positive law or public policy is void.

■■ We reject this contention. In the first place, it is not at all clear that § 389.-797 was intended to apply to the Railroad; it was more or less arbitrarily included in Chapter 389 and does not in terms refer to railroads or to carriers. In any case the argument that indemnity provisions contained in spur track agreements are void because they permit indemnity for a breach of common law or statutory duty has often been advanced and has as often been rejected, at least when the intention of the parties seems clear. The language of paragraph three is very broad and inclusive, broad enough we think to indicate contemplation and inclusion of a possible violation of statutory duty. For reasons many times stated, Industry's argument that the covenant sued on is illegal and void is without merit. Colorado Milling & Elevator Co. v.

5. Which reads: "Any person, firm or corporation doing business in this state, shall keep and maintain those margins alongside their tracks, where such railroad employees are required to walk in the course of their duties, reasonably free from debris and veg-

etation which affects the safety of such employees while working. The Public Service Commission of Missouri shall be empowered to enforce this section and prosecute any violation thereof."

Terminal R.R. Ass'n, 350 F.2d 273, 278–279[13, 14][15] (8th Cir. 1965), cert. denied 382 U.S. 989, 86 S.Ct. 563, 15 L.Ed.2d 476 (1966); Terminal R.R. Ass'n of St. Louis v. Ralston-Purina Co., supra n. 4, 352 Mo. at 1020–1021, 180 S.W.2d at 696–697; Kansas City, M. & B. R.R. Co. v. Southern Ry. News Co., supra n. 4, 151 Mo. at 384–389, 52 S.W. at 207–209[1], 45 L.R.A. at 384–386.

Industry also claims that the Railroad's action was barred by limitation. In this connection, Industry maintains that the Railroad sought recovery on a wholly derivative claim, that the action was not brought within one year and was therefore barred by former § 537.100, which required actions for wrongful death to be commenced within one year after the cause of action accrued. In support of this argument, Industry cites Hacon, Inc. v. Chandeysson Electric Co., 466 S.W.2d 157 (Mo.App.1971), in which the court held that a third-party-responsible action brought by an employer under § 287.-150 was barred by limitation. The employer sought recovery of the amount paid on a death claim.. The court reasoned, correctly we believe, that the employer's right was wholly derivative and was barred by the same statute of limitation which would have barred the dependent's claim.

 The difficulty with this contention of error is that the Railroad declared upon the express covenant contained in paragraph three of the spur track agreement. The Railroad did not seek to assert any derivative right, and if it had we doubt that the same rule applied in Hacon, Inc. v. Chandeysson Electric Co., supra, 466 S.W.2d 157, would apply here. See Annot., 20 A.L.R.2d 925, 927–928, § 2 (1951). It is our view that the Railroad's right of action accrued when the covenant was breached, but to determine whether or not the action was barred by *any* statute of limitation, it would be necessary to ascertain a) whether the covenant sued upon is properly construed as a covenant to indemnify against liability or a covenant to indemnify against loss, Mob-erly v. Leonard, 339 Mo. 791, 800, 99 S.W.2d 58, 63[4] (1936), and b) the time when the action was commenced. For our purposes, it is unnecessary to determine whether paragraph three is intended to indemnify against loss or against liability, or both, because the record does not show when this action was begun. We are assured in Industry's brief that the Railroad's original petition was filed on February 28, 1967. We have no reason to question that statement, but the record before us shows only an amended petition filed June 28, 1971. We cannot accept counsel's statement in the brief as a substitute for a record showing. In re Jackson's Will, 294 S.W.2d 953[1] (Mo. App.1956). And, if the original petition had been included in the transcript we could not take notice of the filing date because it is not among the 96 numbered exhibits offered in evidence. Lightfoot v. Jennings, 363 Mo. 878, 880, 254 S.W.2d 596, 597[3] (1953); Spotts v. Spotts, 331 Mo. 917, 927, 55 S.W.2d 977, 981[6], 87 A.L.R. 660, 667 (1932). Obviously we cannot say the action is barred by limitation, whatever the applicable statute may be.

The argument or contention most vigorously pressed in this court on Industry's appeal has to do with the elements of the Railroad's case and the sufficiency of the evidence to establish those elements. Specifically, Industry complains that it has been held liable solely upon evidence indicating the Railroad effected a prudent, good faith settlement with Mrs. Johnson, and further, it is asserted that no causal relationship between Industry's breach of covenant and the Railroad's loss was established.

The first point—that Industry was held liable solely upon a showing that the Railroad effected a good faith settlement of its potential liability—is very diffusely presented and is difficult to follow. Industry states, in the "argument" part of its brief, that the ultimate decision must turn

upon the language of its contractual obligation. That is undoubtedly true, but Industry does not aid us by attempting to demonstrate in what respect the trial court misconstrued that obligation. Several incidental points are suggested, and we shall attempt to deal with them as we understand Industry's suggestions.

Industry reasserts its contention that it cannot be held liable because it did not place or store the dunnage, "dividers" or "bulkheads" against the west wall of the warehouse. We have already considered and rejected this argument. Industry is not relieved of its contractual duty by the fact that it assigned the performance of that duty to the Frank Lyon Company.

■ A further suggestion is that the trial court should specifically have found that Industry contracted to indemnify the Railroad against the consequences of its own negligence. Kansas City Power & Light Co. v. Federal Const. Corp., supra, 351 S.W.2d at 745[1, 2], is cited in this connection. The case cited holds that a contract to indemnify will not be construed to include the indemnitee's own negligent acts unless such intention appears in clear and unequivocal terms. In our case, the covenant to indemnify concludes with the words "*notwithstanding* any possible *negligence* (whether sole, concurrent or otherwise) on the part of [the Railroad], its agents or employes [sic]." The word "notwithstanding" means "in spite of", Webster's New International Dictionary, p. 1669 (2d ed. 1955); "regardless of" also means "in spite of", id., p. 2096; here the word "notwithstanding" is the equivalent of "regardless of" and the covenant of indemnity properly construed includes losses caused by the Railroad's own negligence. Western Constructors, Inc. v. Southern Pacific Co., 381 F.2d 573, 575[2][3] (9th Cir. 1967).

■ Yet another suggestion is that the Railroad should have been required to establish absolute legal liability to Mrs. John-son. As it was, Industry suggests, the Railroad proved nothing more than a voluntary payment, which it should not be allowed to recover. Industry cites Wells v. Hartford Accident & Indemnity Co., 459 S.W.2d 253 (Mo. banc 1970), which holds that an adjudication of the indemnitee's liability does not estop the indemnitor from raising defenses based on the indemnitor's contract, and Paro v. Pennsylvania R.R. Co., supra, 348 S.W.2d at 616[2], which restates the principle that an indemnitor cannot be held liable for losses paid voluntarily by the indemnitee. Neither case aids Industry's position here. The record makes it appear that the Railroad very promptly investigated the accident which caused Johnson's death; its investigation revealed that the horizontal clearance between the warehouse and the center of the track and the clearance between the loading dock and the center of the track were both insufficient, and that it might be liable to Mrs. Johnson under the provisions of 45 U.S.C.A. § 51. It must be remembered that in making an assessment of its probable liability the Railroad was obliged to take in consideration that it was burdened with a nondelegable duty to provide Johnson with a safe place to work, even though Johnson was working on premises over which the Railroad had no actual control, Shenker v. Baltimore & Ohio R.R. Co., 374 U.S. 1, 7, 83 S.Ct. 1667, 1671–1672, 10 L.Ed.2d 709, 714–715[4] (1963), and that it stood, for practical purposes, stripped of its common law defenses and liable if its negligence played any part, however small, in Johnson's death, and that Mrs. Johnson's case might rest on wholly circumstantial evidence. Rogers v. Missouri P. R.R. Co., 352 U.S. 500, 507–509, 77 S.Ct. 443, 449–450, 1 L.Ed.2d 493, 500 (1957). Industry had covenanted to assume responsibility for and defend as well as indemnify against all liability and claims against the Railroad. Industry was timely notified of Mrs. Johnson's claim, and conduct of the defense or settlement of the claim was tendered in writing by the Railroad. Industry refused

defense or settlement, denied liability, and left the Railroad to do its best to defend the practically indefensible. The Railroad did negotiate a settlement, and it is not seriously argued here that the settlement was imprudent or unreasonable; indeed, the record indicates the contrary.

██ Industry's suggestion that the record does not establish the existence of an indemnifiable loss is obviously without merit. We may point out, as the court did in Moses-Ecco Co. v. Roscoe-Ajax Corp., 115 U.S.App.D.C. 366, 320 F.2d 685, 688–689[3, 4] (1963), that a sum paid in prudent settlement of a claim is not a voluntary payment, but is rather a sum paid under legal compulsion. We may further point out that paragraph three does not exclude indemnification for settlement. In our opinion, the principle stated in Chicago, R. I. & P. R.R. Co. v. Dobry Flour Mills, 211 F.2d 785, 787–788 (10th Cir. 1954), cert. denied 348 U.S. 832, 75 S.Ct. 55, 99 L.Ed. 656 (1954), governs this case. There the court stated, 211 F.2d at 787–788:

> "[1, 2] Ordinarily, to sustain a claim upon an indemnity contract such as we have here, it is necessary for the indemnitee to prove legal liability to the injured party. . . . However . . . where the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee . . . may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. . . . A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability."

See also Missouri Pacific R.R. Co. v. Arkansas Oak Flooring Co., 434 F.2d 575, 580[5, 6] (8th Cir. 1970); Tankrederiet Gefion A/S v. Hyman-Michaels Co., 406 F.2d 1039, 1042–1043[1] (6th Cir. 1969); Trustees, etc. v. Tileston & Hollingsworth Co., 345 Mass. 727, 189 N.E.2d 522, 525–526[1, 2] (1963). Industry is in no position to insist upon a showing of absolute legal liability.

The point most insistently advanced by Industry is that the evidence does not establish a causal relation between its breach of covenant and the damage sustained by the Railroad. This point is argued at length. Industry is in fact insisting that the rules of causation applicable to tort actions be applied in contract actions. The point requires some discussion, but we do not attempt to reach all the incidental contentions raised.

Basically, Industry's argument is that the Railroad was required to show the manner in which Johnson became caught between the boxcar and the loading dock in order to recover on the covenant of indemnity contained in paragraph three. We are reminded that paragraph three requires that the Railroad's loss arise out of or be connected with Industry's failure to maintain proper horizontal clearance between the center of the spur track and the west wall of the warehouse.

The evidence shows that the dunnage piled against the west wall of the warehouse extended out—that is, to the west—to a point 6 feet 1 inch from the center of the track, measured at the top of the rail. The trial court's findings of fact include a finding that the dunnage had been removed from the empty boxcar (which the switch crew removed) in the process of unloading the car, and placed temporarily against the side of the warehouse.[6] Neither the photo-

---

6. This is the construction placed by both parties on Finding of Fact No. 16: "The empty box car which had been located at the dock at the time the train crew first arrived on March 29, 1965 had been unload-ed by Lyon's employees. The dividers, in the process of unloading the car, were removed from the car and placed in a temporary position against the wall of the building."

graphic exhibits nor the measurements made by the Railroad show precisely how far south the pile of dunnage extended from the loading dock, but correlation of the oral evidence with plaintiff's exhibit 2 indicates that the pile of "dividers" or "bulkheads" extended about 14 feet south from the south edge of the dock.

Because the side of the boxcar in question was not flat, the overhang from the east rail of the spur was not uniform, but certain horizontal clearances may be extrapolated from the exhibits. An object clearing the center of the spur track by 5 feet 9 inches would provide 9 inches lateral clearance from the side of the boxcar, 5½ inches from the door runner in which Johnson became caught, and a lateral clearance of 4⅜ inches from the safety ladder located (as the boxcar was situated at the time of the accident) at the northeast corner of the boxcar. Therefore an object clearing the center of the spur at the top of rail by 6 feet 1 inch would provide only 13 inches horizontal clearance from the body of the boxcar; 9½ inches clearance from the door runner, and 8¾ inches clearance from the safety ladder. Normal clearance between the west wall of the warehouse and the boxcar—that is clearance without the stacked dunnage—was reduced about 32 inches. When we consider that a horizontal clearance of 22 inches from the side of the car was held a "very narrow space" supporting a finding of "negligent maintenance" by the railroad in Fish v. Chicago, R. I. & P. Ry. Co., 263 Mo. 106, 172 S.W. 340 (banc 1914), that an 11-inch uniform horizontal clearance was considered unsafe in Terminal R. R. Ass'n of St. Louis v. Ralston-Purina Co., supra n. 4, 352 Mo. 1013, 180 S.W.2d 693, and provision of horizontal clearance of 20 to 24 inches was considered a sufficient ground to find the railroad negligent in Brown v. Missouri, K. & T. Ry. Co., 201 Mo.App. 316, 212 S.W. 26 (1919), it is obvious that Johnson was working in an unsafe place because the stacked dunnage had narrowed his walking area substantially.

Paragraph three of the spur track agreement requires indemnity against liability, claims or losses "in any manner caused by, arising out of or connected with" Industry's breach of covenant. As we think we have demonstrated, the covenant was breached, and the breach is to be held Industry's breach, though it was committed by Industry's assignee. The question is whether the Railroad was required to prove that its liability accrued as a direct and proximate cause of Industry's breach of covenant, as if this were a tort action. We think not.

We are cited to a series of cases primarily to Daniels v. Smith, 471 S.W.2d 508 (Mo. App.1971), which deals with recovery in tort, and to eight cases involving indemnity, none of which is relevant to the point asserted. None of the cases cited by Industry holds that in order to recover upon an indemnity agreement the indemnitee must prove that the indemnitor's breach was the direct and proximate cause of the indemnitee's loss. Our Supreme Court ruled on a similar contention in Terminal R. R. Ass'n of St. Louis v. Ralston-Purina Co., supra n. 4, 352 Mo. at 1020, 180 S.W.2d at 696[5], and concluded it was sufficient if the indemnitor's breach was a cause of the indemnitee's loss. Similar conclusions were reached in Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. R. Co., 199 F.2d 725, 731[4] (8th Cir. 1952), and Buckeye Cotton Oil Co. v. Louisville & N. R. R. Co., 24 F.2d 347, 348[4] (6th Cir. 1928). We believe and hold that the causal connection between Industry's breach of covenant and the Railroad's loss was sufficiently established.

Industry further seeks to avoid liability by arguing that the conduct of the switch crew in continuing its operation despite the open and visible location of the dunnage amounted to acquiescence in the existence of a dangerous condition, barring recovery. Alternatively, Industry maintains that the

conduct of the switch crew amounted to a waiver under paragraph five of the spur track agreement, which provides that either party to the agreement may waive any default of the other without impairing any right arising from any subsequent default. Missouri Pacific R. R. Co. v. Arkansas Oak Flooring Co., supra, 434 F.2d 575; Anthony v. Louisiana & Arkansas Ry. Co., 316 F.2d 858 (8th Cir. 1963); Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., 302 F.2d 843 (3d Cir. 1962), and Western Cas. & Surety Co. v. Shell Oil Co., 413 S.W.2d 550 (Mo. App.1967), are cited to the proposition that the conduct of the switch crew amounted to acquiescence; Hillis v. Blanchard, 433 S.W.2d 276 (Mo. banc 1968), and Pasley v. Marshall, 305 S.W.2d 879 (Mo.App.1957), are particularly relied on in connection with the argument that there was a waiver.

■■■■ Our courts have held that an implied or common law right to indemnity may exist when a person has been exposed to liability and has been compelled to pay damages on account of the negligence of another if the parties are not in equal fault, and this implied right to indemnity has been extended to factual situations very similar to the one at hand. Kansas City Southern Ry. Co. v. Payway Feed Mills, Inc., 338 S.W.2d 1, 5–6[1, 2] (Mo.1960). It may be gathered from the case law that this implied right to indemnity may be barred by "acquiescence", which, it is said, amounts to joint tort-feasance on the part of the indemnitee. Kansas City Southern Ry. Co. v. Payway Feed Mills, Inc., supra, 338 S.W.2d at 5–6; Western Cas. & Surety Co. v. Shell Oil Co., supra, 413 S.W.2d at 556–557[5, 6]; see generally Restatement of Restitution § 95 and comment a, defining and limiting the rule formulated in § 95 (1937). Recent federal cases indicate that the defense of acquiescence has limited application when, as in this case, the right to indemnity arises ex contractu. Rouse v. Chicago, Rock Island and Pacific R. R. Co., 474 F.2d 1180, 1182–1183[1] (8th Cir. 1973); Missouri Pacific R. R. Co. v. Arkansas Oak

Flooring Co., supra, 434 F.2d at 580–581[7, 8]; Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., supra, 302 F.2d at 848–849[4][5][6]. When the indemnitee's claim is founded on an express contract, the applicability of the defense and the effect of the indemnitee's "acquiescence" depend ultimately upon the provisions of the particular contract. Rouse, supra, 474 F.2d at 1182–1183[1] and nn. 1, 2.

■■■■ The "acquiescence" which bars or reduces recovery in an action for indemnity has never been precisely defined, but it has been discussed at length in a number of relevant cases, e. g., Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., supra, 302 F.2d at 848–849[4][5]; Becker v. Central Telephone and Utilities Corp., 365 F.Supp. 984, 988–989 (D.S.Dak.1973), and Western Cas. & Surety Co. v. Shell Oil Co., supra, 413 S.W.2d at 556–557[5, 6]. One element of the defense emphasized over and again is long continued awareness of the dangerous situation by the indemnitee without either taking any corrective measure or calling upon the indemnitor to do so. Another, more general requirement is that the indemnitee's conduct be so seriously wrongful as to make full restitution inequitable. Something more than imputed legal knowledge of a temporary, though dangerous condition is required, and that is all the evidence suggests here. Industry's claim that the Railroad "acquiesced" in the location of the dunnage piled against the warehouse is not supported by the record.

■■■■ Industry's alternative contention is similarly without merit. Hillis v. Blanchard, supra, 433 S.W.2d at 279, is cited to the proposition that a party cannot recover for a breach of contract which he has occasioned, and Pasley v. Marshall, supra, 305 S.W.2d at 881, is relied on for the principle that when one acts in a way inconsistent with the intention of relying on a contractual right, he waives that right. One of the trial court's unchallenged findings was that the Railroad had a right to move the cars on the switch. Further, there is no evi-

dence that any member of the switch crew had authority to waive the provisions of paragraph three of the agreement. A similar contention of waiver was rejected in Gollick v. New York Central R. R. Co., 138 F.Supp. 384, 386–387[1, 2] (E.D.Mich.1956), and we reject the argument here.

The cross-appeal by the Railroad concerns the trial court's allowance of attorneys' fees. The Railroad prayed allowance of attorneys' fees incurred in investigating and compromising Mrs. Johnson's claim plus the fees incurred in establishing its right to indemnity in this action. The trial court found that regular salaried attorneys employed by the Railroad negotiated the settlement of Mrs. Johnson's claim, that the value of their services was $1,000, and allowed recovery of that sum. The court further found, however, that paragraph three of the spur track agreement did not entitle the Railroad to attorneys' fees incurred in establishing its rights in this action.

In this court, the Railroad argues that it is entitled to recover legal expenses incurred in the prosecution of this case because the terms of the spur track agreement purport to indemnify it for such expenditures. An indemnitee, the Railroad says, is generally entitled to recover reasonable attorneys' fees which it is compelled to pay as a result of legal actions brought by or against it in reference to the matter against which it is indemnified. The Railroad cites a number of cases from foreign jurisdictions, particularly Chicago and North Western Ry. Co. v. Rissler, 184 F.Supp. 98, 102–103[11] (D.Wyo.1960), in which attorneys' fees and costs of litigating the action upon the contract of indemnity were recovered. The Railroad stresses the language of the agreements involved in cases it has cited, maintaining that it is so similar to the language of the contract at hand as to compel the conclusion that the cost of this litigation was an indemnifiable loss.

Industry points out in reply that under Missouri law attorneys' fees may not be recovered, generally, unless recovery is specifically allowed by statute or contract. The Railroad concedes as much. Industry further asserts that Orpheum Theater & Realty Co. v. Kansas City Cas. Co., 239 S.W. 841 (Mo.1922), and Kline Cloak & Suit Co. v. Morris, 293 Mo. 478, 240 S.W. 96 (1922), are readily distinguishable. Further, Industry contends that there is not sufficient evidence to establish the reasonable value of the Railroad's necessary attorneys' fees.

■ We are inclined to agree with the trial court's view of the law. We find no local precedent which, in our opinion, reaches the precise question presented. The covenant of indemnity under review provides that Industry shall indemnify and save harmless the Railroad from and against any and all "costs (including attorneys' fees) . . . outlays and expenses in any manner caused by, arising out of or connected with" Industry's breach of the contract. The language is very broad, and the Railroad's position that it covers the expense of this action is at least superficially plausible. Nevertheless, and without prolonging this opinion further, an extensive examination of the authorities convinces us that, properly construed, paragraph three of the agreement before us allows recovery of the attorneys' fees incurred in defense of Mrs. Johnson's claim, but does not extend to services rendered in establishing the right to indemnity. General Electric Co. v. Mason & Dixon Lines, Inc., 186 F.Supp. 761, 762–766[1][2] (W.D.Va.1960).

We find no error materially affecting the merits of the action and the judgment is therefore in all respects affirmed.

All concur except FLANIGAN, J., not participating because not a member of the court when this cause was submitted.